United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 6, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 04-31201

CATRICE JOHNSON, ET AL.

Plaintiffs-Appellants,

versus

HOUSING AUTHORITY OF JEFFERSON PARISH, ET AL.

Defendants-Appellees.

--------------------
Appeal from the United States District Court
for the Eastern District of Louisiana
--------------------

Before REAVLEY, DAVIS, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

The sole question for us to decide in this appeal is whether participants in the federal Housing Act voucher program (the "voucher program") may bring a private action under 42 U.S.C. § 1983[1] to challenge the calculation of their utility allowances by public housing authorities under § 1437f(o)(2) of the United States

---

[1] Section 1983 provides in relevant part:

Every person who, under color of [state law] subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Housing Act[2] and implementing regulations.[3]  In answering this question, we need not and therefore do not reach the merits of the participating tenants' underlying challenge; our inquiry is limited to whether Plaintiffs-Appellants have a private right of action.[4] Concluding that they do, we reverse the district court and remand for further proceedings consistent with this opinion.

## I. FACTS AND PROCEEDINGS

Plaintiffs-Appellants live in Jefferson Parish, Louisiana, and participate in the voucher program under Section 8.  Their residential rents and utility expenses are subsidized through federally-funded vouchers provided by the U.S. Department of Housing and Urban Development (HUD), administered locally by Defendant-Appellee Housing Authority of Jefferson Parish, a public housing authority created by state law.  Another Defendant-Appellee, the Louisiana Housing Development Corporation, is a privately held corporation that contracts with the Housing Authority to operate the voucher program in Jefferson Parish.

This "tenant-based" voucher program differs from traditional "project-based" public housing programs by assisting families

---

[2] United States Housing Act of 1937, 42 U.S.C. § 1437 et seq. (2005).

[3] 24 C.F.R. § 982.517 et seq.

[4] See Morse v. Republican Party, 517 U.S. 186, 234-35 (1996) (deciding only whether there existed a private cause of action and "postpon[ing] any consideration of the merits until after they have been addressed by the District Court").

meeting the statute's low-income standard in renting housing in the private market. The voucher program thus gives participants the flexibility to choose among a variety of housing options. Further, unlike earlier tenant-based programs, which featured a statutory cap that limited a family's permissible housing costs to 30 percent of adjusted monthly income, the current voucher program contains no such cap. It gives participants even greater flexibility in the housing market as well as access to more expensive units that better meet their needs. Under the current program, participating families <u>must</u> contribute <u>at least</u> 30 percent of their adjusted monthly incomes to housing costs, and they <u>may</u> — but need not — spend more. Therefore, the choice of renting a costlier unit is entirely theirs.

In administering the voucher program, the public housing authority issues vouchers that are payable directly to a participant's landlord under a housing assistance payment contract ("HAP contract"), the terms of which are governed by the statute and regulations.[5] Generally, the amount of this payment is calculated as "the amount by which the rent (including the amount allowed for tenant-paid utilities) exceeds ... 30 percent of the monthly adjusted income of the family."[6] The "amount allowed for

_____

[5] <u>See</u> 42 U.S.C. § 1437f(c)-(h); 24 C.F.R. § 982.451-456.

[6] 42 U.S.C. § 1437f(o)(2). Any excess housing costs above a limit referred to as the "payment standard," which is established by HUD and based on fair market value, are borne by the participant. In that situation the family's contribution would be

3

tenant-paid utilities" is determined by the public housing authority, which is directed by regulation to base the utility allowance "on the typical cost of utilities and services paid by energy-conservative households that occupy housing of similar size and type in the same locality ... us[ing] normal patterns of consumption for the community as a whole and current utility rates."[7]  The public housing authority is further required to "review its schedule of utility allowances each year, and must revise its allowance for a utility category if there has been a change of 10 percent or more in the utility rate since the last time the utility allowance schedule was revised."[8]

Plaintiffs-Appellants filed the instant lawsuit in the Eastern District of Louisiana in April of 2004, alleging that Defendants-Appellees (collectively, the "Housing Authority") had not provided them appropriate utility allowances as required by the statute and regulations.  Specifically, they contend that the Housing Authority has failed to use current utility rates in calculating the utility allowance, and that it had not revised its utility allowance schedule from 1995 to 2004 despite annual increases in utility

---

greater than 30 percent of adjusted income, which the voucher program permits at the participant's option.  See id. § 1437f(o)(2)(B).

[7] 24 C.F.R. § 982.517(b)(1).

[8] Id. § 982.517(c)(1).

rates of 10 percent or more in several years during that period.[9] The result, insist Plaintiffs-Appellants, is that their rent burdens have been higher than they would have been had the Housing Authority complied with the statute and the implementing regulations, which these participants seek to enforce through their lawsuit.

In October of 2004, the district court, without oral argument or hearing, granted the Housing Authority's motion to dismiss under Rules 12(b)(1) and (6).[10] The district court held that the portions of the voucher program statute and implementing regulations pertaining to the utility allowance do not create individual federal rights that may be enforced by private participants through a § 1983 action. The district court also denied Plaintiffs-Appellants' motion for leave to file a second amended complaint raising the same challenge.

## II. STANDARD OF REVIEW

---

[9] Plaintiffs-Appellants note in their brief on appeal that the housing authorities of neighboring New Orleans and Kenner had raised their utility allowances at least three times since 1995.

[10] Fed. R. Civ. P. 12(b)(1) (lack of subject matter jurisdiction); Fed. R. Civ. P. 12(b)(6) (failure to state a claim upon which relief can be granted).

We review a district court's dismissal of a complaint under Rules 12(b)(1) and (6) <u>de</u> <u>novo</u>, taking the allegations of the dismissed complaint to be true.[11]

### III. ANALYSIS

Private individuals may bring lawsuits against state actors under 42 U.S.C. § 1983 to enforce not only constitutional rights but also rights created by federal statutes.[12]  It is essential to a private enforcement action under § 1983, however, that the federal statute in question <u>unambiguously</u> give rise to privately enforceable, substantive rights.[13]  The inquiry in this context is virtually the same as that involved in private rights of action implied directly from a federal statute rather than by way of §

---

[11] <u>Vander Zee v. Reno</u>, 73 F.3d 1365, 1368 (5th Cir. 1996).

[12] <u>Maine v. Thiboutot</u>, 448 U.S. 1, 4 (1980) (reasoning that the plain language of § 1983 provides a right of action for persons deprived by state action "of any rights, privileges, or immunities secured by the Constitution <u>and laws</u>," which would include federal statutes).

[13] <u>See</u>, <u>e.g.</u>, <u>Suter v. Artist M.</u>, 503 U.S. 347, 363 (1992) (concluding that "the language relied upon by respondents, in the context of the entire Act ... does not unambiguously confer an enforceable right ...."); <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 451 U.S. 1, 28 n.21 (1981) ("Because we conclude that § 6010 confers no substantive rights, we need not reach the question whether there is a private cause of action under that section or under 42 U.S.C. § 1983 to enforce those rights.").

1983.[14]  In either instance, Congressional intent to create privately enforceable rights is the key.[15]

The Supreme Court applies the three-part test that it enunciated in Blessing v. Freestone to determine whether, in enacting a particular statutory provision, Congress intended to create rights enforceable by private parties:  (1) Congress must have intended that the provision in question benefit the private plaintiff; (2) the right assertedly protected by the statute must not be so "vague and amorphous" that its enforcement would strain judicial competence; and (3) the statute must unambiguously impose a binding obligation on the states, with the asserted right couched in mandatory rather than precatory terms.[16]

The Court's approach to § 1983 enforcement of federal statutes has been increasingly restrictive; in the end, very few statutes are held to confer rights enforceable under § 1983.  The narrowness of the doctrine is typified in Gonzaga University v. Doe, the Court's most recent pronouncement on this point, in which it made clear that it "reject[s] the notion that our cases permit anything short of an unambiguously conferred right to support a cause of

---

[14] See Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002) ("[T]he initial inquiry [in a § 1983 case] ⸻ determining whether a statute confers any right at all ⸻ is no different from the initial inquiry in an implied right of action case ....").

[15] See id. at 283-84.

[16] 520 U.S. 329, 340-41 (1997).

action brought under § 1983."[17]  In _Gonzaga_, in which the three _Blessing_ factors were applied in evaluating a provision of the Family Educational Rights and Privacy Act, the Court unsurprisingly held that the statutory language on which the plaintiffs relied does not support an action under § 1983.[18]

We recognize at the outset, therefore, that the result we reach in this case is a rarity, particularly after _Gonzaga_.  We are nevertheless convinced that its resolution is controlled by the Supreme Court's pre-_Gonzaga_ decision in _Wright v. City of Roanoke Redevelopment & Housing Authority_.[19]  In that case, the Court interpreted a provision of the Housing Act that is _virtually identical_ to the one at issue here, to support (1) _a § 1983 challenge_ (2) _brought by public housing tenants_ concerning (3) the _calculation of their utility allowances_.  As _Wright_ predated _Blessing_ by a decade the Court could not have applied the "_Blessing_ test" under that name, yet the Court's analysis in _Wright_ is wholly consistent with that employed in more recent cases, and indeed constitutes an indispensable element of the current methodology.[20]  Moreover, _Gonzaga_ expressly relied on _Wright_, pointing to it as a

---

[17] 536 U.S. 273, 283 (2002).

[18] See _id._ at 287-90.

[19] 479 U.S. 418 (1987).

[20] See _Blessing_, 520 U.S. at 340-41 (citing _Wright_ as direct authority for the first two factors to be considered in the enforceable rights analysis); see also _Gonzaga_, 536 U.S. at 280 (approving of the analysis and outcome in _Wright_).

paradigmatic example of an appropriate case for finding the presence of a private right of action under § 1983[21] and leaving no doubt that Wright survives as good law.

## A. Wright Dictates the Outcome in this Case

The plaintiffs in Wright were tenants in low-income housing projects owned by the City of Roanoke Redevelopment and Housing Authority.  They sued the Authority under § 1983, alleging that it over-billed them for their utilities and thereby violated the statutory rent ceiling that limited their rent to 30 percent of their adjusted monthly income.  The statutory language at issue, commonly referred to as the Brooke Amendment, stated that "[a] family shall pay as rent for a dwelling unit assisted under this chapter (other than a family assisted under section 1437f(o)[22] of this title) ... 30 per centum of the family's monthly adjusted income ...."[23]  The implementing HUD regulation, in turn, specified that the statutory term "rent" included "reasonable amounts of utilities determined in accordance with the [public housing

---

[21] See Gonzaga, 536 U.S. at 280.

[22] Section 1437f(o), which is expressly set apart and excluded from coverage under the Brooke Amendment, applies to the housing choice voucher program and is the provision at issue in the present case.

[23] 42 U.S.C. § 1437a(a) (1982) (quoted in Wright, 479 U.S. at 420 n.2) (footnote added).

authority's] schedule of allowances for utilities supplied by the project."[24]

The Supreme Court in <u>Wright</u> concluded that "it is clear that <u>the regulations</u> gave low-income tenants an enforceable right to a reasonable utility allowance and that <u>the regulations were fully authorized by the statute</u>."[25]  The Court found "nothing in the Housing Act or the Brooke Amendment evidenc[ing] that Congress intended to preclude petitioners' § 1983 claim ...."[26]  It emphasized that "[t]he Brooke Amendment could not be clearer .... [It] was a mandatory limitation focusing on the individual family and its income.  The intent to benefit tenants is undeniable."[27] The Court expressly determined that "the benefits Congress intended to confer on tenants are sufficiently specific and definite to qualify as enforceable rights under *Pennhurst* and § 1983, rights that are not ... beyond the competence of the judiciary to enforce."[28]  The Court was also unconvinced that "the remedial mechanisms provided [in the Housing Act were] sufficiently comprehensive and effective to raise a clear inference that

---

[24] 24 C.F.R. § 860.403 (1982) (quoted in <u>Wright</u>, 479 U.S. at 420 n.3).  The Supreme Court observed that "HUD has consistently considered 'rent' to include a reasonable amount for the use of utilities ...."  479 U.S. at 420.

[25] 479 U.S. at 420 (emphasis added).

[26] <u>Id.</u> at 429.

[27] <u>Id.</u> at 430.

[28] <u>Id.</u> at 432.

Congress intended to foreclose a § 1983 cause of action for the enforcement of tenants' rights secured by federal law."[29]

Plaintiffs-Appellants in the instant case rely heavily on the Wright precedent in arguing that they, too, have an enforceable right under the Housing Act to challenge the calculation of the utility allowance schedule. The Housing Authority's responsive attempt to distinguish Wright is unconvincing. Although there are differences between the statutory provision involved in Wright and the one at issue here, our careful review of both convinces us beyond cavil that, in adopting the voucher program, Congress intended to create enforceable rights in participating tenants to the same extent as it did in enacting the statute implicated in Wright.

The key distinction upon which the Housing Authority relies is the statutory cap limiting a participating family's rent to 30 percent of adjusted monthly income under the Brooke Amendment (the provision at issue in Wright), while under § 1437f(o) (the voucher program at issue here) a family may choose to pay a greater percentage of its income for housing. This is a classic distinction without a difference. In no way does it compel the conclusion that § 1437f(o)(2) does not create a federal right that can be enforced through § 1983.

---

[29] Id. at 425.

11

We discern no meaningful difference between the statutory entitlement of the plaintiffs in <u>Wright</u> and that of Plaintiffs-Appellants here, regardless of the fact that the latter entitlement gives participants more choices. The effect of an insufficient utility allowance is the same in either case: Participants are forced to pay more out of pocket than 30 percent of their incomes for housing.[30] Further, even though the government housing assistance provided under the voucher program is located in a different section of the Housing Act, when we take the entirety of the legislative enactment into account,[31] we see that Congress acted

---

[30] Even a voucher program participant who is willing to pay more than 30 percent of his income for housing might still be affected by an insufficient utility allowance. For such participants, the monthly assistance payment is equal to the amount of the payment standard established by HUD, minus 30 percent of income. 42 U.S.C. § 1437f(o)(2)(B).

Although a participant whose rent alone (exclusive of the utility allowance) exceeds the payment standard is not at all affected by the utility allowance, one whose rent is below the standard but by an amount less than the properly-calculated utility allowance, might be affected by an insufficient allowance. To illustrate this point, assume hypothetically a payment standard of $1000, apartment rent of $800, utility allowance of $150, and a monthly income of $666.67. Under these assumptions, the monthly assistance payment would be $750 ((800+150) - (30% of 666.67)). If, however, it were later determined that the assumed $150 utility allowance was improperly calculated, and that it should have instead been $275, the monthly assistance payment would rise to $800; the participant could now "max out" his benefit even though he would be paying more than 30% of his income towards housing costs. He would get the full amount of the payment standard minus 30% of income and would be responsible for any costs above the payment standard, $75 in this example.

[31] See <u>Suter</u>, <u>supra</u> note 13, at 357 ("The opinion[ ] in ... Wright ... took pains to analyze the statutory provisions in detail, <u>in light of the entire legislative enactment</u>, to determine whether the language in question created 'enforceable rights,

12

with precisely the same overarching intent in both sections, viz., to assist low-income families in obtaining a decent place to live.[32] Logic prevents the conclusion that Congress could have intended to create enforceable rights for one group of Housing Act rental assistance recipients but not the other. Indeed, in the voucher program Congress essentially validated Wright's holding.[33] The Supreme Court's holding in Wright that Congress intended for the complaining tenants to have an enforceable right under the Housing Act and thus be able to challenge the calculation of the utility allowance schedule, applies with equal force to the instant case.

(1) Congressional Intent to Benefit Plaintiffs

Congress's intent to provide meaningful housing assistance benefits to individual families participating in the voucher program is just as undeniable as it was with respect to families

_____

privileges, or immunities within the meaning of § 1983.") (emphasis added).

[32] See 42 U.S.C. § 1437f(a) (statement of purpose for low income housing assistance); see also id. § 1437(a) (declaration of policy for general program of assisted housing).

[33] In determining the legislative intent underlying the enactment of the voucher program, we assume that Congress was aware of the Supreme Court's prior decision in Wright and that the Court's interpretation of the Brooke Amendment in that decision is reflected in the voucher program statute. See Cannon v. Univ. of Chicago, 441 U.S. 677, 696-97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law."). Indeed, Congress's awareness of Wright is evidenced by its express provision — in the language of the voucher program statute itself — for the "amount allowed for tenant-paid utilities," which was not present in the Brooke Amendment but was implied by the Court in Wright. See Wright, 479 U.S. at 420.

13

covered under the Brooke Amendment.  <u>The statutory language could not be clearer</u> in providing for "the monthly assistance payment for a family receiving assistance."[34]  Still, the Housing Authority argues in its appellate brief that Congress did not so clearly intend to benefit voucher program participants because the statutory language "addresses rights and duties that flow between the [public housing authority] and the landlord, while the participants are indirect beneficiaries."[35]  According to the Housing Authority, the statute's "focus is on fair compensation to the landlord.  Rather than being concerned with the needs of these individuals, the statute is concerned with requiring these individuals to pay what Congress has determined to be their fair share of the rent."

This distortion of the statute flies in the face of its plain language.  The fact that the assistance payments happen to be disbursed directly to the landlord rather than to the tenant is of no consequence.  Congress plainly expressed its intent to provide housing assistance for the benefit of the low-income families

---

[34] 42 U.S.C. § 1437f(o)(2).

[35] The Housing Authority also notes that HUD regulations expressly deny voucher program participants third party beneficiary rights in the HAP contract between the public housing authority and the landlord, citing 24 C.F.R. § 982.456.  The effect of this limitation, however, is only that voucher recipients are precluded from "assert[ing] any claim ... <u>under the HAP contract</u>,"  <u>id.</u> § 982.456(c) (emphasis added); it has no bearing on Congress's intent to provide housing assistance for their benefit.

participating in the program[36]; it would be absurd to treat the voucher program as a landlords' relief act!

If anything, the benefit to participants under § 1437f(o)(2) is even more direct than the benefit that the Supreme Court so construed in Wright.  The Court observed that the Brooke Amendment "was a mandatory limitation focusing on the individual family and its income."[37]  The language of that amendment that the Court held to provide an undeniable benefit stated only that "[a] family shall pay as rent ... 30 per centum of the family's monthly adjusted income"[38]; the government assistance to cover any remaining housing costs was merely implied.  In contrast, the benefit provided by the statutory language of the voucher program is undeniably direct. Its object is the "monthly assistance payment for a family," a tangible, government-funded benefit focused directly on the family. Even though the voucher is made payable to the landlord, Congress's obvious intent was for such payment to benefit the participating tenant.

The Housing Authority also asserts that, unlike in Wright, when "resort to the HUD regulation was not necessary to establish

---

[36] The text of the statute, in providing for "the monthly assistance payment for a family," is undoubtedly "phrased in terms of the persons benefited."  See Gonzaga, 536 U.S. at 284 (quoting Cannon, 441 U.S. at 692 n.13).

[37] 479 U.S. at 430 (emphasis added).

[38] 42 U.S.C. § 1437a(a) (1982) (quoted in Wright, 479 U.S. at 420 n.2).

15

the right," Plaintiffs-Appellants in the present case "must reach through the statute to find the right to a utility allowance schedule that is created by a regulation ...." Yet, once again, the statutory basis for private enforcement is even stronger here than it was in <u>Wright</u>. In fact, the Housing Authority's argument gets it exactly backwards.[39] The statutory language at issue in <u>Wright</u> made no mention at all of the utility allowance. It provided only for "rent," which was subsequently defined —— <u>by</u> <u>regulation</u> —— to include "reasonable amounts of utilities determined in accordance with the [public housing authority's] schedule of allowances for utilities supplied by the project."[40]

In contrast, the statutory language of the voucher program unmistakably provides —— in the text of the act itself —— for an "amount [to be] allowed for tenant paid utilities."[41] Contrary to the Housing Authority's assertion, the HUD regulations are not necessary to establish Plaintiff-Appellants' right to the utility allowance, and certainly no more so than they were in <u>Wright</u>, where such an allowance was not even mentioned in the text of the statute

---

[39] The argument overlooks the Supreme Court's statement in <u>Wright</u> that "it is clear that <u>the regulations</u> gave low-income tenants an enforceable right to a reasonable utility allowance ...." 479 U.S. at 420 (emphasis added). Contrary to the Housing Authority's assertion, therefore, resort to the HUD regulation was necessary to establish the right in <u>Wright</u>.

[40] 24 C.F.R. § 860.403 (1982) (quoted in <u>Wright</u>, 479 U.S. at 420 n.3).

[41] 42 U.S.C. § 1437f(o)(2)(A), (B).

itself.  Congress's intent to benefit Plaintiffs-Appellants here cannot be gainsaid.

(2) Enforcement Not Beyond Judicial Competence

The regulatory commands to public housing authorities — (1) to base the utility allowance "on the typical cost of utilities and services paid by energy-conservative households that occupy housing of similar size and type in the same locality ... us[ing] normal patterns of consumption for the community as a whole and current utility rates,"[42] and (2) to "review [the] schedule of utility allowances each year, and ... revise [the] allowance for a utility category if there has been a change of 10 percent or more in the utility rate since the last time the utility allowance schedule was revised"[43] — are not beyond the competence of the judiciary to enforce.  As the Supreme Court observed in Wright, "[t]he regulations ... specifically set out guidelines that the [public housing authorities] were to follow in establishing utility allowances"; and the Court concluded that this mandate was not so vague and amorphous as to exceed the ability of the judicial branch to enforce.[44]

The Housing Authority argues further that the discretion it enjoys in calculating the utility allowance schedule renders the

---

[42] 24 C.F.R. § 982.517(b)(1).

[43] Id. § 982.517(c)(1).

[44] 479 U.S. at 431–32.

statute and regulations unenforceable in the courts. It characterizes as "inherently imprecise [the] task to determine the amorphous 'typical cost of utilities and services paid by energy-conservative households that occupy housing of similar size and type' in Jefferson Parish." Although the calculation and maintenance of the utility allowance schedule may not be an exact science, courts surely are capable of at least reviewing the actions taken by public housing authorities to ensure that they have acted within their discretion.[45] Additionally, the requirement that public housing authorities review their allowances each year and revise them "if there has been a change of 10 percent or more in the utility rate" since the last revision, admits of no discretion at all and could easily be determined and enforced by a court. In short, just as the Supreme Court held in Wright, we hold that the statute and regulations pertaining to the utility allowance are not so vague and amorphous as to be beyond the competence of the judiciary to enforce.

(3) Statute Unambiguously Imposes A Binding Obligation In Mandatory Terms

_____

[45] See Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 519-20 (1990) ("That the [Boren] Amendment gives the states substantial discretion in choosing among reasonable methods of calculating rates may affect the standard under which a court reviews whether the rates comply with the Amendment, but it does not render the Amendment unenforceable by a court. While there may be a range of reasonable rates, there certainly are some rates outside that range that no State could ever find to be reasonable and adequate under the Act.").

18

Together, the plain statutory provision for "the amount allowed for tenant-paid utilities," and, in turn, the wording of the implementing regulation specifying the method and calculation to be used in setting the allowance, unambiguously impose a binding obligation on public housing authorities. Referring our attention back to the first step of the analysis, the Housing Authority argues that somehow it is not bound by the obligation to maintain the utility allowance in conformity with the regulation, arguing that its only obligation is to HUD, and that it has none to program participants. This argument fails for the reasons we have already discussed.[46]

The Housing Authority next contends that its obligations are not binding because HUD may waive them for good cause.[47] This argument fails, however, for the simple reason that there is no record evidence (or contention) that the Housing Authority ever applied for any such waiver, much less received one. The regulations are binding on the Housing Authority unless and until HUD should grant it a waiver. Moreover, the extent of any waiver relating to the utility allowance that the Housing Authority might obtain would be restricted to the requirement that the Housing Authority revise the allowance when there is an annual utility rate increase of 10 percent or more: HUD has never provided for waivers

_____

[46] See supra text accompanying notes 40–43.

[47] See HUD Notice 2005-9, at 3.

19

of the other regulatory requirements that the Housing Authority is alleged to have violated.[48] The statute and regulations unambiguously impose binding obligations on public housing authorities vis-à-vis the calculation, maintenance, and revision of utility allowances.

(4) No Comprehensive Enforcement Scheme

Even when, as here, our analysis of the Blessing factors leads to the conclusion that Congress intended to create privately enforceable rights, "there is only a rebuttable presumption that the right is enforceable under § 1983."[49] This is because the possibility exists that Congress could have foreclosed that remedy by providing another.[50] "When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983."[51] The Housing Authority argues in its appellate brief that here, "[t]he remedy for a [public housing authority's] failure to comply with HUD regulations ranges from a reduction in the amount of funds paid to [it] by HUD up to a complete termination from the program."[52] The Housing Authority advances

---

[48] See id.

[49] Blessing, 520 U.S. at 341.

[50] Id.

[51] Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 20 (1981).

[52] See 42 U.S.C. § 1437g(j)(4)(A).

20

further that even though the regulations require public housing authorities to provide an opportunity for informal hearings concerning the application of the utility allowance schedule to a particular family's needs, these regulations do not require such hearings concerning the establishment of the utility allowance schedule itself.[53]

As in <u>Wright</u>, however, there is absolutely no indication in the statute that Congress intended for <u>exclusive</u> enforcement authority to be vested in HUD.[54] "HUD's authority to audit, enforce annual contributions contracts, and cut off federal funds ... are generalized powers [that] are insufficient to indicate a congressional intention to foreclose § 1983 remedies."[55] Both methods of enforcement, i.e., HUD oversight and private actions under § 1983, may coexist if Congress so intends. And, even though <u>Gonzaga</u> emphasized <u>Pennhurst's</u> observation that Spending Clause legislation is most often enforced by the withholding of federal funds rather than by private lawsuits,[56] the Court recognized and approved of <u>Wright</u> as an exception to this general rule. The Court

---

[53] <u>See</u> 24 C.F.R. § 982.555(b)(3).

[54] <u>See</u> 479 U.S. at 424.

[55] <u>Id.</u> at 428.

[56] "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." <u>Gonzaga</u>, 536 U.S. at 280 (quoting <u>Pennhurst</u>, 451 U.S. at 28).

21

reasoned that the lack of a sufficient federal review mechanism permitting tenants to complain of purported noncompliance weighed against a conclusion that Congress intended to preclude enforcement under § 1983.[57]  Here, as acknowledged by the Housing Authority, voucher program participants are not entitled under the regulations to a hearing concerning establishment of the utility allowance schedule, and no other avenue of relief is provided.  There simply is no comprehensive federal remedial scheme provided for the voucher program that would demonstrate Congressional intent to preclude Plaintiffs-Appellants' right to bring a § 1983 suit.

B. Banks v. Dallas Housing Authority

We turn briefly to the Housing Authority's contention that this case is not governed by Wright but by our decision in Banks v. Dallas Housing Authority, in which we considered a different provision of the Housing Act and determined that it did not create a right enforceable under § 1983.[58]  The Housing Authority's reliance on Banks is misplaced:  The statutory provision at issue in that case does not even resemble the one that Plaintiffs-Appellants seek to enforce here.  Banks dealt with an earlier version of 42 U.S.C. § 1437f(e), which authorized HUD to "make assistance payments ... pursuant to a contract with owners ... who

_____

[57] See id. at 280, 290.

[58] 271 F.3d 605 (5th Cir. 2001).

22

agree to upgrade housing so as to make and keep such housing decent, safe, and sanitary ...."[59]

Banks is helpful in the present case only as a reference point along the continuum of decisions concerning § 1983 enforcement of asserted federal statutory rights. The obvious differences between the statutory provision considered in Banks and the one at issue here plainly put Banks at the opposite end of the spectrum, indeed very near Gonzaga.[60] Congress's requirement in the former § 1437f(e) that owners keep and maintain their properties "decent, safe, and sanitary" as a condition of their receipt of funds, is easily distinguished from its provision in § 1437f(o)(2) for a "monthly assistance payment for the family," including a reasonable utility allowance, obviously a tangible government benefit that is directly focused on the family and its income. This provision much more closely resembles the Brooke Amendment at issue in Wright than it does the former § 1437f(e). Banks simply has no bearing on this case.

IV. CONCLUSION

---

[59] 42 U.S.C. § 1437f(e) (1990) (quoted in Banks, 271 F.3d at 606, with emphasis).

[60] Compare Gonzaga, 536 U.S. at 280 (emphasizing that in conditional spending legislation the typical remedy for state noncompliance with conditions is termination of federal funds), with Banks, 271 F.3d at 610 ("obligation is binding only in the sense that [it] is a condition that Congress placed upon the [landlord's] receipt of Section 8 rent assistance").

23

We reverse the order of the district court dismissing Plaintiffs-Appellants' claim on grounds that they do not have a right to sue under § 1983 to enforce the statute and regulations concerning the calculation and revision of their utility allowances. Although the statutory provision sought to be enforced in this case and that involved in <u>Wright</u> are not the same verbatim, the differences between them are immaterial to the issue of § 1983 enforcement, and the Supreme Court's decision and reasoning in <u>Wright</u> control the outcome here. The Housing Authority's attempts to distinguish <u>Wright</u>, and to liken this case to our decision in <u>Banks</u>, are unpersuasive. Application of the <u>Blessing</u> factors bolsters our conclusion that the Congressional intent underlying the Brooke Amendment at issue <u>Wright</u>, as discerned by the Supreme Court, is equally present here. We hold that in adopting § 1437f(o)(2), Congress intended to grant to voucher program participants like these Plaintiffs-Appellants, federal rights enforceable under § 1983. For these reasons, the decision of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.