JOSEPH S. and Steven W.; Disability Advocates, Inc.; and Sidney Hirschfeld, Director, Mental Hygiene Legal Service, Second Judicial Department, Plaintiffs,

v.

Michael F. HOGAN, in his official capacity as Commissioner of the New York State Office of Mental Health; The New York State Office of Mental Health; Richard F. Daines, in his official capacity as Commissioner of the New York State Department of Health; The New York State Department of Health; and David A. Paterson, in his official capacity as Governor of the State of New York, Defendants.

No. CV–06–1042 (BMC)(SMG).

United States District Court,
E.D. New York.

May 23, 2008.

Beth D. Jacob, Lori D. Greendorfer, Schiff, Hardin & Waite, New York, NY, Cliff Zucker, Roger A. Bearden, Amy E. Lowenstein, Disability Advocates, Inc., Albany, NY, Dennis Bruce Feld, Lisa Volpe, Mental Hygiene Legal Service, Mineola, NY, Marianne Engelman Lado, Nisha Suresh Agarwal, Sandra Del Valle, Lawyers for the Public Interest, New York, NY, for Plaintiffs.

Deborah Hochhauser, Joanne Skolnick, Office of the Attorney General, New York, NY, John P. Gasior, Assistant Attorney General, New York, NY, for Defendants.

### *ORDER*

COGAN, District Judge.

This case is before me on the Report & Recommendation of Magistrate Judge Steven M. Gold dated April 21, 2008[93], in which he recommended denial of defendants' motion to dismiss, except as to the Nursing Home Reform Act ("NHRA") claims that he found time-barred. Plaintiffs and defendants have timely objected. Having conducted a *de novo* review, I adopt the Report & Recommendation as the Order of this Court and overrule the parties' objections, as I agree with the analysis of each point addressed by Judge Gold. The only issue warranting additional comment is plaintiffs' hyperbolic invocation of *Muller v. State*, 179 Misc.2d 980, 686 N.Y.S.2d 652 (1999), which plaintiffs describe as the progenitor of a "*Muller* line of cases." There is no "*Muller* line of cases," and a single Court of Claims decision cannot be said to constitute the law of New York. *See King v. Order of United Commercial Travelers*, 333 U.S. 153, 160–61, 68 S.Ct. 488, 492–93, 92 L.Ed. 608 (1948); *Singleton v. City of New York*, 632 F.2d 185, 199 (2d Cir.1980). I agree with Judge Gold that the reasoning of that case is not persuasive.

It is therefore ORDERED that defendants' motion to dismiss is denied except as to the time-barred NHRA claims.

**SO ORDERED.**

*REPORT and RECOMMENDATION*

STEVEN GOLD, United States Magistrate Judge:

### INTRODUCTION

This case concerns New York state's obligation to provide mental health services and treatment to individuals with mental illness in the most integrated setting appropriate to their individual needs. Approximately 400,000 adults are served by New York state's public mental health system.[1] These individuals are treated in hospitals, residential facilities, outpatient clinics, and other community-based treatment settings. Finding the proper placement within the spectrum of services available for an individual with mental illness is no doubt often a difficult and complex problem. According to plaintiffs, hun-

---

1. The OMH Ctr. for Performance Evaluation and Outcomes Mgmt., Progress Report on New York State's Public Mental Health System 3 (Jan.2001), *available at* http://www.omh.state.ny.us/omhweb/progressreport/PrgRptLR.pdf.

dreds, and perhaps thousands, of individuals with mental illness are residing in nursing homes who could be residing and receiving treatment in less restrictive, community-based programs.

Plaintiffs have filed a second amended complaint asserting claims pursuant to three federal statutes on behalf of individuals with mental illness residing in nursing homes: Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, 12132; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794; and the Federal Nursing Home Reform Act ("NHRA"), 42 U.S.C. § 1396r.[2] Generally, the ADA and Section 504 prohibit discrimination against individuals with disabilities, including individuals with mental illness. The ADA was passed, in part, to combat discrimination against individuals with disabilities, including discrimination in the form of unnecessary segregation of those with disabilities in nursing homes and other institutions. *See Kathleen S. v. Dep't of Pub. Welfare of Pa.*, 10 F.Supp.2d 460, 468 (E.D.Pa.1998) (*citing* 134 Cong. Rec. 9384 (1988)). The federal regulations implementing both the ADA and Section 504 have specific provisions, referred to as "integration" regulations or mandates, that require public entities to treat individuals with disabilities in the "most integrated setting appropriate to the[ir] needs." 28 C.F.R. §§ 35.130(d), 41.51(d). In *Olmstead v. Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court held that these integration mandates require a state to provide services to individuals in community settings rather than institutions whenever the relevant professionals conclude that the services required by the individual may appropriately be rendered in a community setting, unless the expense involved would fundamentally alter the state's overall services and programs.

The NHRA was passed specifically to end the practice of inappropriately institutionalizing individuals with mental illness or mental retardation in nursing homes. The NHRA imposes stringent procedures that states and nursing homes must follow before and after an individual with mental illness or mental retardation is admitted to a nursing home.

Defendants move to dismiss the complaint on various grounds pursuant to Federal Rule of Civil Procedure 12(b). For the reasons and with the limited exception stated below, I respectfully recommend that defendants' motion be denied.

## PROCEDURAL HISTORY

On March 8, 2006, Disability Advocates, Inc. ("DAI") and Sidney Hirschfeld, Director of Mental Hygiene Legal Service, Second Judicial Department ("MHLS"), together with individual plaintiffs, filed a complaint against Sharon E. Carpinello, in her official capacity as Commissioner of the New York State Office of Mental Health, the New York State Office of Mental Health ("OMH"), Antonia C. Novello, in her official capacity as Commissioner of the New York State Department of Health, the New York State Department of Health ("DOH"), and George Pataki, in his official capacity as Governor of the State of New York.[3] On June 29, 2007,

---

**2.** Section 504 was enacted in 1973. Congress passed the NHRA as part of the Omnibus Budget Reconciliation Act of 1987. To redress deficiencies with Section 504, the ADA was enacted in 1990. *See Helen L. v. DiDario*, 46 F.3d 325, 330–33 (3d Cir.1995) (discussing the history of Section 504 and the ADA). As discussed *infra*, claims under the ADA and

Section 504 are often alleged and analyzed in tandem.

**3.** In the original complaint, there were seven named individual plaintiffs: Edwin T., Bradley W., Omar W., Carlos S., Justina F., Lisa H., and Joseph S.

defendants requested a pre-motion conference with respect to their anticipated motion to dismiss. The Honorable Brian M. Cogan then referred the motion to me for a report and recommendation. During a conference held on July 10, 2007, I granted plaintiffs an opportunity to file an amended complaint that might address some of the deficiencies identified by the defendants prior to the filing of any motions. On July 24, 2007, DAI and MHLS, together with three individual plaintiffs—Edwin T., Joseph S., and Steven W.—filed their amended complaint against Michael F. Hogan, who replaced Sharon Carpinello as Commissioner of OMH, Richard F. Daines, who replaced Antonia Novello as Commissioner of DOH, and Eliot Spitzer, who replaced George Pataki as Governor, as well as against two state agencies, OMH and DOH. Defendants filed their motion to dismiss the amended complaint on September 18, 2007.

I heard argument on defendants' motion on February 21, 2008. During the oral argument, I granted plaintiffs an opportunity to amend their complaint again to address defendants' contentions, including the argument that some claims lacked sufficient specificity. Plaintiffs filed a Second Amended Complaint ("Sec.Am.Compl."), together with a post-hearing letter ("Pl.Letter"), on March 5, 2008, Docket Entry 89, and defendants filed a response ("Def.Letter") on March 12, 2008, Docket Entry 91.[4]

## OVERVIEW

As noted above, plaintiffs bring this action on behalf of individuals with mental illness who have been or will be unlawfully discharged from psychiatric hospitals and hospital psychiatric wards to nursing homes, and seek declaratory and injunctive relief on their behalf. According to plaintiffs, New York State's flawed mental health system has the effect of warehousing individuals with mental illness in nursing homes in violation of federal laws. Plaintiffs allege that New York State has failed to provide these individuals with programs and services in the most integrated setting appropriate to their needs. Moreover, plaintiffs contend that, once placed in the nursing homes, individuals do not receive the rehabilitative services or mental health treatment they need, and therefore are unable to transfer to community-based treatment programs. Essentially, plaintiffs argue that thousands of New York residents with mental illness are languishing for years in nursing homes, some of them outside of New York State or far away from family members, on locked wards or otherwise unable to leave the facility, without receiving the mental health treatment they need and despite the fact that they do not require a nursing home's level of care. Plaintiffs allege that these nursing homes have become *de facto* psychiatric hospitals, but without the psychiatric services that a hospital setting provides.

The state, and more specifically, OMH and DOH, are required by state law to care for and treat individuals with mental illness. The NHRA's Preadmission Screening and Resident Review ("PASRR") process imposes additional responsibilities on the defendants.

Pursuant to New York Mental Hygiene Law,

The state of New York and its local governments have a responsibility . . .

---

4. In the second amended complaint, Edwin T. is no longer named as a plaintiff. In addition, Eliot Spitzer was named in his official capacity as governor of New York. On March 17, 2008, however, David A. Paterson replaced Eliot Spitzer as governor of New York. Accordingly, pursuant to Federal Rule of Civil Procedure 25(d), Paterson is substituted as a defendant in this action in place of Spitzer.

for the comprehensively planned care, treatment and rehabilitation of their mentally ill citizens. Therefore, it shall be the policy of the state ... to develop a comprehensive, integrated system of treatment and rehabilitative services for the mentally ill. Such a system should include, whenever possible, the provision of necessary treatment services to people in their home communities; it should assure the adequacy and appropriateness of residential arrangements for people in need of service; and it should rely upon improved programs of institutional care only when necessary and appropriate.

N.Y. MENTAL HYG. LAW § 7.01. To implement these policies and goals, the legislature established OMH, and charged it with responsibility for "develop[ing] an effective, integrated comprehensive system for the delivery of all services to the mentally ill...." *Id. See also id.* § 7.07. As the state agency responsible for developing and implementing New York's mental health policies and programs, OMH operates inpatient psychiatric hospitals and licenses and funds psychiatric wards of hospitals licensed pursuant to Article 28 of the New York Public Health Law ("Article 28 hospitals"). Sec. Am. Compl. ¶ 48.

DOH operates New York's Medicaid program. In that capacity, DOH provides payment for individuals with mental illness living in nursing homes and is responsible for ensuring compliance with the NHRA. *Id.* ¶¶ 56, 57. DOH is also the state agency in charge of licensing, supervising, and enforcing laws applicable to nursing homes and Article 28 hospitals. *Id.* ¶¶ 58, 59.

At its most basic level, the NHRA requires that states accepting federal Medic-

aid funds have a screening plan, specifically a PASRR plan, to ensure that decisions to place individuals in nursing facilities are made appropriately. 42 U.S.C. § 1396r(e)(7)(A)(i); 42 C.F.R. § 483.104. Level I of the PASRR program requires that the State "identify all individuals who are suspected of having [mental illness]" and who are being referred to a nursing home. 42 C.F.R. § 483.128(a). PASSR "Level II is the function of evaluating and determining whether [nursing facility] services and specialized services are needed." *Id.*

When an individual with mental illness is hospitalized, either in a psychiatric hospital or in a psychiatric ward of an Article 28 hospital, there may come a time when his treatment team determines that he is ready to be discharged to a less restrictive setting. At that time, a discharge service plan is prepared by a staff member on his treatment team. *See* N.Y. MENTAL HYG. LAW § 29.15 (regulating discharge planning). If the team concludes that he should be discharged to a nursing home, the state must be notified of that determination. The NHRA and its implementing regulations obligate the applicable state agency, here defendant OMH, to assess whether the patient in fact requires the level of services provided by a nursing home before he or she may be placed there. *See* 42 U.S.C. § 1396r(e)(7)(A)(i); 42 C.F.R. §§ 483.106(d)(1), 483.112(a), 483.132(d). Although OMH's determination must be "based on an independent physical and mental evaluation performed by a person or entity" other than OMH, OMH is ultimately responsible for the PASRR determination that an individual requires a nursing home level of care.[5] 42

5. Once admitted to a nursing home, the nursing home must conduct resident assessments within fourteen days of admission, at least every year, and after a significant change in an individual's physical or mental condition.

42 U.S.C. § 1396r(b)(3)(C)(i). In addition, a nursing home must conduct informal resident reviews every three months. *Id.* § 1396r(b)(3)(C)(ii).

C.F.R. § 483.106(d)(1); *see also id.* §§ 483.106(e)(3), 483.112(a), 483.132(d). In addition, OMH's Level II PASRR determination must include whether an individual also needs specialized services for mental illness, *id.* §§ 483.106(d)(1), 483.112(b), and if so, the state must ensure that the required services are provided, *id.* § 483.126. Finally, a nursing home must notify OMH if there has been a "significant change" in an individual's mental or physical condition. 42 U.S.C. § 1396r(e)(7)(B)(iii). Once notified, OMH must review and determine whether the individual still requires nursing level of services. *Id.*

## STANDARDS GOVERNING A MOTION TO DISMISS

Defendants move to dismiss the various claims in the complaint on the following seven grounds: 1) that the plaintiffs fail to allege a *prima facie* claim of discrimination sufficient to state causes of action for violations of the ADA and Section 504; 2) that the NHRA does not confer a right of action enforceable through § 1983, and that even if the court concludes that it does, plaintiffs' complaint is vague and conclusory and fails to meet the requirements of Federal Rule of Civil Procedure 8; 3) that DAI and MHLS lack associational standing to bring these claims; 4) that the governor is not properly named as a defendant; 5) that the complaint fails to allege the necessary causal connection between plaintiffs' injuries and defendants' actions and therefore the individual plaintiffs lack standing; 6) that the complaint fails to name necessary parties; and 7) that certain claims are outside the statute of limitations period.

The Federal Rules of Civil Procedure require only that a complaint set out a "short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P. 8. Motions to dismiss address the sufficiency of plaintiffs' complaint, not the sufficiency of plaintiffs' evidence, and a court deciding a motion to dismiss must accept all allegations in the complaint as true and draw all inferences in favor of the non-moving party. *See Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003).

For many years, courts construing Rule 12 motions applied the rule set forth in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), that a complaint should be dismissed only if "it appear[ed] beyond doubt that the plaintiff c[ould] prove no set of facts in support of his claim which would entitle him to relief." Last year, however, the Supreme Court abandoned the *Conley* "no set of facts" language and instead adopted a "plausibility standard." *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 1968–69, 167 L.Ed.2d 929 (2007). That is, a complaint should allege "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the plaintiffs' claims. *Id.* at 1965. The Second Circuit has interpreted the Court's *Twombly* decision "not [as] requiring a universal standard of heightened fact pleading, but ... instead [as] requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007). "Once a claim has been adequately stated, [however,] it may be supported by showing any set of facts consistent with the allegations in the complaint." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007).

Thus, some amount of factual detail is now required to survive a Rule 12(b)(6) motion to dismiss. On the one hand, a complaint comprised only of "labels and conclusions, and a formulaic recitation of the elements of a cause of action" is insuf-

ficient; on the other hand, a complaint should not be dismissed so long as plaintiffs provided sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly,* —— U.S. at ——, 127 S.Ct. at 1965.

## DISCUSSION

### 1. Failure to State ADA and Section 504 Claims

Defendants first contend that plaintiffs' complaint fails to state ADA and Section 504 claims. Defendants argue that plaintiffs' complaint does not identify obligations that defendants have but do not meet.

#### a. The ADA and Section 504 of the Rehabilitation Act

Congress enacted the ADA after finding that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Accordingly, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* § 12132. Section 504 of the Rehabilitation Act has a similar provision.[6] *See* 29 U.S.C. § 794(a). Claims under the two statutes are treated identically unless—unlike here—one of the minor differences in the two disability acts

is pertinent to a claim. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003).

The Second Circuit has stated that

In order to establish a violation under the ADA, the plaintiffs must demonstrate that (1) they are "qualified individuals" with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.

*Id.* at 272. To establish a violation of Section 504, plaintiffs bear the additional burden of showing that defendants receive federal funding. *Id.* Plaintiffs have sufficiently alleged all of these elements and therefore have adequately pled claims under the ADA and Section 504. *See* Sec. Am. Compl. ¶¶ 187–96 (ADA violation); *id.* ¶¶ 199–209 (Section 504 violation).

■ Plaintiffs bring their ADA and Section 504 claims alleging violations of the statutes' "integration mandates" issued by the United States Attorney General. The ADA directs the Attorney General to promulgate implementing regulations. 42 U.S.C. § 12134(a). Pursuant to that authority, the Attorney General has issued an "integration regulation" or "integration mandate," to combat the historical segregation and isolation of those with mental illness. It provides as follows: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).[7] A failure to provide "place-

---

**6.** Section 504 provides:

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or

under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

**7.** *See also* 28 C.F.R. § 41.519(d) (integration regulation pursuant to Section 504); 45 C.F.R. § 84.4(b)(2) (same). Agency regulations should be given substantial deference in

ment 'in a setting that enables disabled individuals to interact with non-disabled persons to the fullest extent possible' " violates the ADA's integration mandate. *Messier v. Southbury Training Sch.,* 1999 WL 20910, at *9 (D.Conn. Jan.5, 1999) (*quoting* 35 C.F.R. Pt. 35, App. A at 450).

> [P]laintiffs may establish a prima facie violation of 28 C.F.R. § 35.130(d) by proving that [defendants] place certain residents [in a more restrictive setting than required], even though [those] exercising professional judgment have determined previously that the most integrated setting for those residents is a community placement.

*Id.* at *10.

■ In *Olmstead v. Zimring,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court considered the scope of the ADA's integration mandate: "Specifically, we confront the question whether the proscription of discrimination [in Title II of the ADA] may require placement of persons with mental disabilities in community settings rather than in institutions. The answer, we hold, is a qualified yes." *Olmstead,* 527 U.S. at 587, 119 S.Ct. at 2181. The Court held that "[u]njustified isolation ... is properly regarded as discrimination based on disability," *id.* at 597, 119 S.Ct. at 2185, noting that "Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" *Id.* at 600, 119 S.Ct. at 2187 (*quoting* 42 U.S.C. §§ 12101(a)(2), 12101(a)(5)). Thus, unnecessary segregation of individuals with mental illness is discrimination *per se* and a violation of the ADA; no demonstration of differential treatment between individuals with mental illness and those without is

required. *See Helen L.,* 46 F.3d at 333, 335 (holding that evidence of discriminatory animus is not required to establish an ADA or Section 504 claim); *Messier,* 1999 WL 20910, at *9 (The ADA "prohibits states from providing services to individuals with disabilities in an unnecessarily segregated setting, even absent a showing of differential treatment between disabled and nondisabled persons.").

Plaintiffs in *Olmstead* were psychiatric patients in a state hospital who remained institutionalized even after medical professionals determined that their needs could be met in community-based settings. The Court concluded that,

> under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Olmstead,* 527 U.S. at 607, 119 S.Ct. at 2190. Thus, plaintiffs here may prevail if the complaint alleges, with sufficient factual detail to render their claims plausible, that individuals are placed in nursing facilities even though 1) a determination has been made that a particular individual's needs may be met in a more integrated setting, 2) the individual consents to reside in a more integrated setting, and 3) the state can reasonably accommodate a placement in a more integrated setting.

■ Defendants argue that *Olmstead* requires that the determination that an individual's needs may be met in a more integrated setting must be made by a *state* mental health professional. Def. Mem. 22–23; Def. Letter.[8] Defendants contend

---

interpreting a statute. *See Olmstead,* 527 U.S. at 597–98, 119 S.Ct. at 2185–86.

**8.** "Def. Mem." refers to the Memorandum of Law in Support of Defendants' Motion to

Dismiss the First Amended Complaint, submitted on September 18, 2007, Docket Entry 74.

that, because the second amended complaint does not allege that any state mental health professional made any finding about any of the plaintiffs, it fails to state a claim under either the ADA or Section 504. However, the language from *Olmstead* concerning determinations by "the State's treatment professionals," 527 U.S. at 587, 607, 119 S.Ct. at 2181, 2190, appears to be based on the particular facts of that case and not central to the Court's holding. Indeed, the determinations regarding community treatment for both of the named plaintiffs in *Olmstead* were made by their *treating* professionals, who also happened to be the state's treatment professionals simply because the plaintiffs were institutionalized in a state facility. *Id.* at 593, 119 S.Ct. at 2183. Accordingly, I reject defendants' argument that *Olmstead* requires that the state's mental health professionals be the ones to determine that an individual's needs may be met in a more integrated setting. *See Fisher v. Ok. Health Care Auth.,* 335 F.3d 1175, 1181 (10th Cir.2003) ("[U]nder *Olmstead* and the applicable ADA regulations, when *treatment professionals* have determined that community placement is appropriate for disabled individuals, those individuals do not oppose the placement, and the provision of services would not constitute a 'fundamental alteration,' states are required to place those individuals in community settings rather than institutions.") (emphasis added); *Messier,* 1999 WL 20910, at *10 (implicitly acknowledging that the relevant determination may be made by treating professionals, who may or may not be employed by defendant state agencies); *but see Martin v. Taft,* 222 F.Supp.2d 940, 972 (S.D.Oh.2002) ("*Martin 2002* ") (requiring plaintiffs to plead "that the state's professionals have determined the plaintiffs are qualified for community-based care, or by pleading facts from which it may be inferred that the determinations of the state's profes-

sionals are manifestly unreasonable"). Moreover, it is not clear whether *Olmstead* even requires a specific determination by *any* medical professional that an individual with mental illness may receive services in a less restrictive setting, or whether that just happened to be what occurred in *Olmstead.* *Cf. Fisher,* 335 F.3d at 1181–82 (concluding that even those not currently institutionalized but only at risk of unjustified segregation may bring suit); *Martin 2002,* 222 F.Supp.2d at 965 ("*Olmstead's* central holding [is] that unnecessary institutionalization of persons with mental disabilities constitutes discrimination under the ADA.").

### b. Analysis of Plaintiffs' ADA and Section 504 Claims

Plaintiffs first allege that nursing homes are "highly-segregated institutions." *Id.* ¶¶ 93–95, 100–03, 117. Plaintiffs contend that individuals with mental illness in nursing homes "cannot leave without setting off alarms, and have little access to the outdoors, much less to the community outside the institution." *Id.* ¶ 93. More specifically, plaintiffs allege that at two large nursing homes in New Jersey where New York residents with mental illness have been placed, "residents with mental illness [are] segregated from the other residents of the nursing home" because they reside on separate floors and are not allowed to leave their floors unless they have "special passes." *Id.* ¶ 101. *See also id.* ¶ 117 (alleging that New York nursing homes similarly restrict movement within their facilities). Plaintiffs contend that Steven W., one of the named plaintiffs, "is unable to leave the facility unescorted and is unable to leave the floor without supervision. He wears a device on his wrist that triggers an alarm if he attempts to leave the floor or the facility without permission." *Id.* ¶ 139.

Plaintiffs further allege that many of the individuals with mental illness who are re-

siding in nursing homes do not require any nursing or medical care, and are eligible to receive treatment in more integrated community settings. Sec. Am. Compl. ¶¶ 6–8, 10–11, 41, 79–83, 86–87, 90, 92, 189. Defendants argue that, even if *Olmstead* does not require findings by a state's treatment professionals, there must be *some* medical determination that an individual's needs may be met in a less segregated setting before the integration mandate is violated. Def. Mem. 11. Although the complaint could be clearer, the allegations cited above are sufficient to suggest that there has been a professional determination that the clinical needs of these individuals may be met in an integrated, community-based setting. In fact, the complaint specifically alleges that a mental health professional evaluated Joseph S. and determined that his needs could be met in a more integrated setting. Sec. Am. Compl. ¶ 129. In addition, the complaint states that the named plaintiffs would consent to reside in a more integrated setting. *Id.* ¶¶ 28, 134, 140.

Plaintiffs' allegations that individuals with mental illness are unnecessarily segregated in highly restrictive nursing homes, even though their needs could be met in a more integrated setting, and that these individuals desire to reside in a more integrated setting, are adequate to state violations of the ADA and Section 504 under *Olmstead* and meet *Twombly's* plausibility standard. *See Martin 2002*, 222 F.Supp.2d at 973; *Messier*, 1999 WL 20910, at *10; *Cramer v. Chiles*, 33 F.Supp.2d 1342, 1353 (S.D.Fla.1999) ("Institutionalization of individuals with devel-

opmental disabilities, against their will, where less confining programs will satisfy their needs, violates the Americans with Disabilities Act's integration requirements.").[9] Accordingly, plaintiffs have sufficiently alleged that defendants fail to "administer [their] services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Moreover, the allegations concerning the restrictions on freedom within the nursing homes amply state a claim for a violation of the integration mandate because these restrictions on an individual's freedom prevent them from interacting with "nondisabled persons to the fullest extent possible." 35 C.F.R. Pt. 35, App. A at 450; *see also Messier*, 1999 WL 20910, at *9.

Plaintiffs' general allegations are supported by specific factual assertions with respect to the named plaintiffs. *See ATSI Commc'ns*, 493 F.3d at 98 ("Once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint."). Both named plaintiffs allege that they have a mental illness, but "no medical or mental condition that requires nursing home care." Sec. Am. Compl. ¶ 27; *see also id.* ¶¶ 128–29, 137. Moreover, both are "able to, qualified for, and would like to live in a more integrated setting" than the nursing homes where they reside. *Id.* ¶¶ 134, 140. *See also id.* ¶ 28. Specifically, plaintiff Joseph S. has resided in a New York nursing home since his discharge from a state psychiatric hospital in September, 2003. *Id.* ¶ 127. The hospital discharge plan for Joseph S. "did not contain

---

**9.** The cases cited by defendants in their memorandum and letter, Def. Mem. 21, 24–25, Def. Letter, are inapposite as they interpret the ADA's reasonable accommodation and equal access requirements and not the integration mandate. *See Henrietta D.*, 331 F.3d at 272–73; *Rodriguez v. City of New York*, 197

F.3d 611, 618–19 (2d Cir.1999); *Doe v. Pfrommer*, 148 F.3d 73, 81–83 (2d Cir.1998); *Lincoln Cercpac v. Health & Hosps. Corp.*, 147 F.3d 165, 167–68 (2d Cir.1998); *Leocata v. Wilson–Coker*, 343 F.Supp.2d 144, 155 (D.Conn.2004).

a medical reason for nursing home placement." *Id.* ¶ 128; *see also id.* ¶ 29. In addition, as noted above, Joseph S. was evaluated by an independent agency while in the nursing home and was determined not to require nursing level of care. *Id.* ¶ 129. Similarly, Steven W. was discharged in June, 2004 from a psychiatric ward of a New York state hospital to a nursing home, where he continues to reside today. *Id.* ¶¶ 135–36. His discharge plan also failed to state a medical reason for nursing home placement, although it did include a proposal for community reintegration.[10] *Id.* ¶ 137; *see also id.* ¶ 30.

■ Defendants argue that, even if plaintiffs are entitled to receive services in a less segregated setting, the second amended complaint fails to allege how it is that defendants are responsible for plaintiffs having been placed in nursing home facilities. Def. Letter. *Olmstead,* however, made clear that "under Title II of the ADA, *States* are required to provide community-based treatment for persons with mental disabilities" when appropriate and when other criteria are met. *Olmstead,* 527 U.S. at 607, 119 S.Ct. at 2190 (emphasis added). *See also* N.Y. MENTAL HYG. LAW § 7.01 (entrusting to OMH the statutory duty "to develop an effective, integrated comprehensive system for the delivery of all services to the mentally ill. . . ."); Sec. Am. Compl. ¶ 71 ("OMH must operate New York's public mental health system in order to serve individuals with mental illness in the most integrated setting consistent with their clinical needs."); *id.* ¶ 47.

■ Defendants also invoke the discussion in *Olmstead* that suggests that an entity may be excused from providing community-based treatment if it "can demonstrate that making the modifications [necessary to offer such treatment] would fundamentally alter the nature of the service, program, or activity" of the entity, pursuant to 28 C.F.R. § 35.130(b)(7). *Olmstead,* 527 U.S. at 605–06, 119 S.Ct. at 2189. Defendants argue that the broad relief that plaintiffs seek here would require a fundamental alteration to the state's mental health policies and practices. Def. Mem. 26. Nonetheless, it would be inappropriate to dismiss plaintiffs' ADA and Section 504 claims for this reason at this stage of the litigation because defendants bear the burden of establishing "fundamental alteration" as a defense. *See Olmstead,* 527 U.S. at 604–06, 119 S.Ct. at 2189 (noting that a state has the burden of establishing a fundamental alteration defense); *Radaszewski v. Maram,* 383 F.3d 599, 614–15 (7th Cir.2004) (holding that the cost-benefit analysis that must be undertaken to assess a fundamental alteration defense is not appropriately made at the pleading stage); *Martin 2002,* 222 F.Supp.2d at 972 ("[W]hether [the] requested relief would entail a fundamental alteration is a question that cannot be answered in the context of a motion to dismiss.").

■ For all these reasons, I conclude that plaintiffs' complaint meets the requirements of Rule 8 and *Twombly's* plausibility standard and sufficiently pleads ADA and Section 504 causes of action.

## 2. *Section 1983 Right of Action under the NHRA*

Plaintiffs' claims under the NHRA, although not specifically invoking § 1983, *see* Sec. Am. Compl. ¶¶ 12, 163–181, 212–28, are brought pursuant to that statute. Sec.

---

10. I infer that the discharge treatment plan from the hospital included community reintegration because plaintiffs' follow-up statement is that his treatment plan was changed, eliminating the community reintegration aspect of his prior plan, shortly after his arrival at the nursing home.

Am. Compl. ¶ 20; Pl. Mem. 24.[11] Defendants contend that plaintiffs' complaint fails to state a claim upon which relief can be granted because the NHRA and its implementing regulations do not create federal rights enforceable through a § 1983 action.

### a. Supreme Court Framework for § 1983 Analysis

Under § 1983, an individual may obtain relief for a violation of constitutional or federal statutory rights. *See Maine v. Thiboutot*, 448 U.S. 1, 4–6, 100 S.Ct. 2502, 2504–05, 65 L.Ed.2d 555 (1980) (recognizing that § 1983 actions may be brought to enforce rights created by federal statutes in addition to constitutional rights). "In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*" *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997). Thus, if a plaintiff alleges a violation of a federal law as the basis of a § 1983 action, the court must determine whether the federal statute involved confers an individual right. Plaintiffs bear the burden of establishing that a statute gives rise to federal rights enforceable through § 1983. *See Blessing,* 520 U.S. at 342, 346, 117 S.Ct. at 1360, 1362; *Williams v. U.S. Dep't of Hous. & Urban Dev.*, 2006 WL 2546536, at *9 (E.D.N.Y. Sept.1, 2006) (describing it as "axiomatic that *the plaintiff must demonstrate* that' the statute creates an individual right") (*quoting City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120, 125 S.Ct. 1453, 1458, 161 L.Ed.2d 316 (2005)).

The Supreme Court has outlined a three-part test for determining whether a statute gives rise to a federal right:

First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Blessing,* 520 U.S. at 340–41, 117 S.Ct. at 1359 (citations omitted). Moreover, "[e]ven if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. . . . [D]ismissal is proper if Congress 'specifically foreclosed a remedy under § 1983.' " *Id.* at 341, 117 S. Ct at 1360 (*quoting Smith v. Robinson*, 468 U.S. 992, 1005 n. 9, 104 S.Ct. 3457, 3464, 82 L.Ed.2d 746 (1984)).

Although the language used in *Blessing* suggests that the first prong of its test is satisfied if it is clear that the plaintiff is an intended beneficiary of the statute, the Supreme Court has since rejected this proposition and narrowed the scope of the first *Blessing* factor. In *Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), the Court recognized that some courts had interpreted *Blessing*

as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable

---

**11.** "Pl. Mem." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint, submitted on November 16, 2007, Docket Entry 82.

directly from the statute itself under an implied private right of action.

*Gonzaga,* 536 U.S. at 283, 122 S.Ct. at 2275. The Court then explicitly rejected the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. Section 1983 provides a remedy only for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Accordingly, it is *rights,* not the broader or vaguer "benefits" or "interests," that may be enforced under the authority of that section.

*Id.* The *Gonzaga* Court held that, for a federal statute to confer an individual right enforceable under § 1983, it must include "explicit rights-creating" language "phrased in terms of the persons benefited." *Id.* at 284, 122 S.Ct. at 2276 (internal quotation marks and citation omitted). As examples of "explicit rights-creating" language, the Court cited Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 because the statutes, each of which declares that *"[n]o person"* shall be subjected to discrimination, *id.* at 284 n. 3, 122 S.Ct. at 2275–76 (*quoting* 42 U.S.C. § 2000d; 20 U.S.C. § 1681(a)), "are phrased 'with an *unmistakable focus* on the benefited class,'" *id.* at 284, 122 S.Ct. at 2275–76 (citation omitted). In contrast, "[s]tatutes that focus on the [entity or] person regulated rather than the individuals protected

create 'no implication of an intention to confer rights on a particular class of persons.'" *Alexander v. Sandoval,* 532 U.S. 275, 289, 121 S.Ct. 1511, 1521, 149 L.Ed.2d 517 (2001) (*quoting California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981)). The *Gonzaga* Court concluded that the statute at issue there—the Family Educational Rights and Privacy Act ("FERPA")—does not create individual rights because the provisions speak "only in terms of institutional policy and practice ... [and] have an 'aggregate' focus[;] they are not concerned with 'whether the needs of any particular person have been satisfied,' and they cannot 'give rise to individual rights.'" *Gonzaga,* 536 U.S. at 288, 122 S.Ct. at 2278 (*quoting Blessing,* 520 U.S. at 343–44, 117 S.Ct. at 1361).[12]

The *Gonzaga* Court did emphasize that funding statutes generally do not give rise to a § 1983 right of action. *Id.* at 280–81, 122 S.Ct. at 2273–74 (*citing Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 28, 101 S.Ct. 1531, 1540, 1545, 67 L.Ed.2d 694 (1981)). The Court, however, expressly distinguished and did not overrule its holding in an earlier case, *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). In *Wilder,* the Supreme Court held that a private right of action existed under a provision of the Medicaid Act that uses language similar to that involved in this case.[13] Citing *Wilder* with approval

---

**12.** The relevant FERPA section, 20 U.S.C. § 1232g(b)(1), at issue in *Gonzaga* provides:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents to any individual, agency, or organization.

*Gonzaga,* 536 U.S. at 279, 122 S.Ct. at 2273.

**13.** The section at issue in *Wilder* provided

> a State plan for medical assistance must—
> ...
> provide ... for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ...) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate

and referring to the statutory language at issue there, the *Gonzaga* Court stated that "Congress left no doubt of its intent for private enforcement . . . because the provision[, 42 U.S.C. § 1396a(a)(13)(A),] required States to pay an 'objective' monetary entitlement to individual health care providers, with no sufficient administrative means of enforcing the requirement against States that failed to comply." *Gonzaga*, 536 U.S. at 280–281, 122 S.Ct. at 2274.

### b. *Pertinent Post–*Gonzaga *Case Law from Courts of Appeals*

Several decisions from Courts of Appeals shed light on how to determine whether a statutory provision confers an individual right post-*Gonzaga.* In particular, several courts have considered whether various provisions of the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.,* which includes the NHRA, confer enforceable rights.

One such post-*Gonzaga* case was decided by the Second Circuit. In *Rabin v. Wilson–Coker,* 362 F.3d 190, 201–02 (2d Cir.2004), plaintiffs were Medicaid recipients who sued under § 1983 based on 42 U.S.C. § 1396r–6 of the Medicaid Act. Section 1396–r essentially affords families receiving Medicaid with a grace period before losing their benefits when their income rises. The statute provides that

each State plan approved . . . must provide that each family which was receiving aid pursuant to a plan of the State . . . in at least 3 of the 6 months immediately preceding the month in which such family becomes ineligible for such aid . . . shall . . . remain eligible for assistance under the plan . . . during the

immediately succeeding 6–month period . . . .

42 U.S.C. § 1396r–6.

The Second Circuit's analysis in *Rabin* included a detailed discussion of *Gonzaga.* The court pointed out that the statute at issue in *Gonzaga* was held to be " 'two steps removed from the interests of the individual students and parents' " because it "only forbade the government from funding schools that demonstrated a 'policy or practice' of disclosing student records." *Rabin*, 362 F.3d at 201 (*quoting Gonzaga*, 536 U.S. at 287, 122 S.Ct. at 2277). Distinguishing the provision in *Gonzaga*, the Second Circuit found that § 1396r–6 "focuse[d] much more directly than d[id] the FERPA provision on the individual's entitlement. In particular, it contains no qualifying language akin to FERPA's 'policy or practice.' " *Id.* The Second Circuit recognized that § 1396r–6 requires state plans to provide for families to continue receiving aid, "rather than directly requiring that all eligible persons receive the assistance." *Id.* Nonetheless, the court rejected defendants' argument that the statute as a result had an "aggregate" and administrative policy focus and concluded that "[b]ecause all of the language of Section 1396r–6 except the 'plan requirements' language, reflects Congress's intention to confer a right to [assistance] upon persons who meet the various eligibility requirements, we find that Section 1396r–6 can support a Section 1983 claim." *Id.* at 202. *Cf. NextG Networks of N.Y., Inc. v. City of New York,* 513 F.3d 49, 52–53 (2d Cir.2008) (finding that a provision of the Telecommunications Act with respect to regulation of telecommunica-

---

to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services . . . and to assure that individuals eligible for medical assistance have reasonable ac-

cess . . . to inpatient hospital services of adequate quality.

*Wilder*, 496 U.S. at 502–503, 110 S.Ct. at 2514 (*quoting* 42 U.S.C. § 1396a(a)(13)(A) (1982 ed., Supp. V)).

tions providers did not create individual rights enforceable by providers where statute placed limitations on state and local governments and did not confer any benefit on providers);[14] *Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury,* 445 F.3d 136, 150 (2d Cir.2006) (A "statute[ ] which provides that a state or municipality may not 'enact or enforce' certain kinds of laws governing motor carriers of property, 49 U.S.C. § 14501(c)(1), is not 'phrased in terms of the persons benefitted;' ... the statute focuses on the regulated actors ... [and] has an aggregate, rather than an individual, focus.").

Other circuits have also held that provisions of the Medicaid Act may give rise to rights enforceable in a § 1983 action. In *Sabree v. Richman,* 367 F.3d 180 (3d Cir. 2004), the Third Circuit considered whether 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(15) conferred individual rights that could be enforced in a § 1983 action.[15] The court reviewed the relevant Supreme Court precedent, including *Gonzaga.* The provisions at issue in *Sabree* required a state to provide reasonably prompt payment for certain services rendered on behalf of individuals with mental retardation in intermediate care facilities. *Sabree,* 367 F.3d at 182. The Third Circuit found the language of the Medicaid Act provisions—"A State plan must provide"—to be indistinguishable from the Titles VI and IX language—"No person shall"—that the *Gonzaga* Court concluded was explicit rights-creating language conferring an enforceable right. *Id.* at 190.

Relying to some extent on *Wilder,* which had identical language and was found to confer individual rights, the Third Circuit held that the Medicaid provisions provided rights enforceable through § 1983. *Id.* at 192.

The First, Fourth, Fifth, and Ninth Circuits have all held that the same Medicaid provisions considered in *Sabree* confer individual rights. *Bryson v. Shumway,* 308 F.3d 79, 88–89 (1st Cir.2002) (holding that § 1396a(a)(8) creates an enforceable right); *Doe v. Kidd,* 501 F.3d 348, 356 (4th Cir. 2007) (same); *S.D. ex rel. Dickson v. Hood,* 391 F.3d 581, 603 (5th Cir.2004) (holding that § 1396a(a)(10), even though phrased in terms of the requirements a state plan must meet, creates an enforceable right); *Watson v. Weeks,* 436 F.3d 1152, 1155 (9th Cir.2006) (same). *See also Sanders ex rel. Rayl v. Kan. Dep't of Social & Rehab. Servs.,* 317 F.Supp.2d 1233, 1249 (same). Courts of Appeals have also found that other Medicaid provisions confer individual rights. *See Ball v. Rodgers,* 492 F.3d 1094, 1103 (9th Cir.2007) (finding that the Medicaid Act's free choice provisions, 42 U.S.C. §§ 1396n(c)(2)(C) and (d)(2)(C), confer individual rights); *Harris v. Olszewski,* 442 F.3d 456, 461–62 (6th Cir.2006) (finding that Medicaid's freedom-of-choice provision, 42 U.S.C. § 1396a(a)(23), created individual rights enforceable through § 1983). In contrast, courts have almost unanimously held that the Equal Access provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(30)(A), does not

---

**14.** The section at issue provides: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." *NextG Networks,* 513 F.3d at 52 (*quoting* 47 U.S.C. § 253(a)).

**15.** Section 1396a(a)(8) provides: "A State plan for medical assistance must—... provide

that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." Section 1396a(a)(10) provides in relevant part: "A State plan for medical assistance must ... provide ... for making medical assistance available ... to all [eligible] individuals...."

confer any rights.[16] *Equal Access for El Paso, Inc. v. Hawkins,* 509 F.3d 697, 704 (5th Cir.2007) ("The Equal Access provision has a clearly aggregate and systemic focus that deals with institutional policy and procedures, rather than an individualized focus concerned with whether the needs of any particular person or class of recipients have been satisfied."); *Westside Mothers v. Olszewski,* 454 F.3d 532, 542 (6th Cir.2006) (collecting cases). *See also Lankford v. Sherman,* 451 F.3d 496, 509 (8th Cir.2006) (finding that Medicaid's reasonable-standards requirement, 42 U.S.C. § 1396a(a)(17), "focuses on the aggregate practices of the state" and therefore does not create individual rights).

Finally, and in the context of a different statutory scheme, the Fifth Circuit recently considered whether a provision of the United States Housing Act could be enforced in a § 1983 action. *Johnson v. Hous. Auth. of Jefferson Parish,* 442 F.3d 356, 360 (5th Cir.2006), *cert denied* —— U.S. ——, 127 S.Ct. 136, 166 L.Ed.2d 36 (2006). The statute at issue in *Johnson* referred to "famil[ies] receiving tenant-based assistance" and set forth the means for calculating "the monthly assistance payment for the family." 42 U.S.C. §§ 1437f(o)(2)(A), (B). Recognizing the significance of *Gonzaga,* the Fifth Circuit noted that the Supreme Court's "approach to § 1983 enforcement of federal statutes has been increasingly restrictive; in the end, very few statutes are held to confer rights enforceable under § 1983." *Id.* at 360. Nevertheless, the court found that Congress unambiguously intended the Housing Act provision at issue to benefit families and thus to create an enforceable

right. The Fifth Circuit cited a provision that provided for "the monthly assistance payment *for a family* receiving assistance," and concluded that *"[t]he statutory language could not be clearer." Id.* at 363 (first emphasis added). *See also id.* n. 36 (The text of the statute, in providing for "the monthly assistance payment *for a family,"* is undoubtedly "phrased in terms of the persons benefited.") (*citing Gonzaga,* 536 U.S. at 284, 122 S.Ct. at 2276).

### c. Analysis of the NHRA

Plaintiffs argue that the NHRA creates federal rights enforceable under § 1983. More specifically, plaintiffs contend that defendants are responsible for implementing the NHRA's Preadmission Screening and Resident Review ("PASRR") provisions, 42 U.S.C. §§ 1396a(a)(28) and 1396r(e)(7), and the related PASRR regulations, 42 C.F.R. §§ 483.100–483.138, and that the defendants' failure "to operate a PASRR system consistent with the NHRA" is a violation of plaintiffs' federal rights. Sec. Am. Compl. ¶¶ 228; *see also id.* ¶¶ 212–27.

Section 1396a(a)(28) provides that a state plan for medical assistance must ensure that nursing facilities comply with § 1396r(b)-(d), and that the state itself complies with § 1396r(e). Subsection (e) of § 1396r, titled "State requirements relating to nursing facility requirements," has the following PASRR provision:

> [T]he State must have in effect a preadmission screening program, for making determinations ... for mentally ill ... individuals ... who are admitted to nursing facilities....

---

**16.** Section 1396a(a)(30)(A) states that

A state plan for medical for medical assistance must ... provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary

utilization ... and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

...

[I]n the case of each resident of a nursing facility who is mentally ill, the State mental health authority must review and determine ... whether or not the resident, because of the resident's physical and mental condition, requires the level of services provided by a nursing facility ... and whether or not the resident requires specialized services for mental illness.

42 U.S.C. §§ 1396r(e)(7)(A)(i) and (e)(7)(B)(i).

There is no question that plaintiffs meet the first *Blessing* factor as individuals "within the general zone of interest that [§ 1396r] is intended to protect." 520 U.S. at 340–41, 117 S.Ct. at 1359. Indeed, the Second Circuit in *Concourse Rehabilitation & Nursing Center, Inc. v. Whalen,* 249 F.3d 136 (2d Cir.2001), specifically noted that Medicaid recipients were the intended beneficiaries of § 1396r. In *Concourse Rehabilitation,* plaintiffs were nursing facilities suing the State Department of Health after an audit revealed that the nursing facilities had been overpaid under the state's Medicaid program. Plaintiffs alleged violations of the federal Medicaid Act, pursuant to § 1396a(a)(13)(A) and § 1396r, the latter being the provision at issue in this case. The Second Circuit examined both provisions to determine whether they give rise to a § 1983 action and concluded, with respect to § 1396r, that it did not entitle *nursing facilities* to bring suit.[17] The court held: "It is clear from the plain language of this provision[, § 1396r(b)(4)(A),] that it was not 'intend[ed] to benefit the putative plaintiff[s]'—here the health care providers. Rather, the provision is obviously intended to benefit Medicaid beneficiaries." *Concourse Rehabilitation,* 249 F.3d at 143–44 (internal citation omitted). *See also Bock Assocs. v. Chronister,* 951 F.Supp. 969, 974 (D.Kan.1996) (finding that a service provider was not "an intended beneficiary of the [PASRR] requirements[, which were] ... intended to improve the quality of care for patients and to save money for the state and federal governments").

As *Gonzaga* made clear, however, meeting *Blessing's* "zone of interest" test is not enough; for plaintiffs' NHRA claims to survive, they must satisfy *Gonzaga's* stricter requirement that the statute contain, with respect to Medicaid nursing home residents, "explicit rights-creating terms," *Gonzaga,* 536 U.S. at 284, 122 S.Ct. at 2276, "phrased with an *unmistakable focus* on the benefited class," *id.,* 122 S.Ct. at 2275 (internal quotation marks and citation omitted). The question is close because, while the intent of the NHRA is clearly to benefit individuals with mental illness, the PASRR provision, 42 U.S.C. § 1396r(e)(7), is phrased in terms of the requirements that states must meet to maintain federal funding.

Courts that have considered whether the NHRA may give rise to a § 1983 action by a Medicaid recipient have come to different conclusions. *Compare Rolland v. Romney,* 318 F.3d 42 (1st Cir.2003) (find-

---

**17.** Section 1396r(b)(4)(A) "requires nursing facilities to 'provide ... specialized rehabilitative services to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident.'" *Concourse Rehab.,* 249 F.3d at 143 (*quoting* 42 U.S.C. § 1396r(b)(4)(A)). Section 1396a(a)(13)(A) requires payment of nursing facility services "'through the use of rates []determined in accordance with methods and standards developed by the state which ... take into account the costs ... of complying with [other] sections....'" *Id.* at 140 (*quoting* 42 U.S.C. § 1396a(a)(13)(A) (1994)). The court held that the nursing facility could sue under § 1396a(a)(13)(A), relying on *Wilder,* 496 U.S. at 510, 110 S.Ct. at 2517–18, because this provision, in contrast to § 1396r(b)(4)(A), "is clearly intended to benefit health care providers." *Id.* at 144.

ing a private right of action under § 1396r); *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 387 n. 5 (5th Cir.2003) (assuming without deciding that a right of action exists under § 1396r(e)(7)(C)(i)(I) of the NHRA); *Ottis v. Shalala*, 862 F.Supp. 182, 187 (W.D.Mich.1994) (finding nursing home resident had a private right of action under § 1396r); *Martin v. Voinovich*, 840 F.Supp. 1175, 1200–02 (S.D.Oh.1993) ("*Martin 1993*") (same), *with Sparr v. Berks County*, 2002 WL 1608243 (E.D.Pa. July 18, 2002) (finding no private right of action under § 1396r); *Brogdon ex. rel. Cline v. Nat'l Healthcare Corp.*, 103 F.Supp.2d 1322, 1330–32 (N.D.Ga.2000) (no private right of action against nursing home). Most of these decisions, however, were rendered prior to the Supreme Court's decision in 2002 in *Gonzaga*, which, as noted above, narrowed the scope of the first *Blessing* factor.

The only two post-*Gonzaga* NHRA decisions—*Rolland* and *Sparr*—curiously came to opposite conclusions as to whether § 1396r creates an enforceable right of action. *Rolland* barely mentions *Gonzaga* (the decision is noted twice in passing—once in footnote eight and again with respect to the question of whether the statute is "vague & amorphous"), and *Sparr* fails to cite *Gonzaga* at all. These cases thus fail to provide any useful guidance for determining whether § 1396r creates an enforceable right after *Gonzaga*.

Analyzing the PASRR provisions of the NHRA in light of *Gonzaga*, I conclude that they confer individual rights upon plaintiffs. Unlike the statutes in *Gonzaga* and *Blessing*, §§ 1396r(e)(7)(A) and (B) are di-

rectly concerned with "whether the needs of any particular person have been satisfied." *Blessing*, 520 U.S. at 343, 117 S.Ct. at 1361, *quoted in Gonzaga*, 536 U.S. at 288, 122 S.Ct. at 2278. In *Blessing*, the Court pointed out that the statute at issue provided a "yardstick for the Secretary to measure the *systemwide* performance" of a state program. *Id.* at 343, 117 S.Ct. at 1361. Here, in contrast, the statute's concern is whether *each individual* placed in a nursing home actually requires nursing care, and if so, what additional services the individual requires. 42 U.S.C. §§ 1396r(e)(7)(A)(i), (e)(7)(B)(i); *see also id.* § 1396r(b)(3)(F)(i) (outlining the requirements for the state's determinations).

The NHRA provision requiring preadmission screening includes specific language referring to the persons benefited— "determinations ... for mentally ill ... individuals." 42 U.S.C. § 1396r(e)(7)(A)(i); *see also id.* § 1396r(b)(3)(F)(i) (State must determine "prior to admission that, because of the physical and mental condition of the individual, the individual requires the level of services provided by a nursing facility, and, if the individual requires such level of services, whether the individual requires specialized services for mental illness."). The language in the provision requiring resident reviews uses language that is even more clearly "rights-creating"—"in the case of each resident of a nursing facility who is mentally ill...." 42 U.S.C. § 1396r(e)(7)(B)(i). Although these provisions are phrased in terms of the responsibilities imposed upon a state, their plain purpose is to protect the rights of individuals.[18] *See Johnson*, 442 F.3d at 360, 363 (finding a right of action by low-income families even though the provision

---

18. In addition, the regulations implementing the NHRA, although by themselves not creating enforceable rights, offer strong support that the NHRA confers an individual right. 42 C.F.R. § 483.106(d)(1) ("The [PASRR] determinations of whether *an individual* requires the level of services provided by a [nursing facility] and whether specialized ser-

vices are needed ... must be made by the State mental health authority ....") (emphasis added); *id.* §§ 483.112(a),(b) ("For each [nursing facility ('NF')] applicant with [mental illness ('MI')] ..., the State mental health ... authority ... must determine ... whether, because of the resident's physical and

at issue required payments be made to landlords as opposed to being made to the intended beneficiaries of the statute, low-income families). They are thus distinguishable from the FERPA provision that the Court found to be "two steps removed from the interests of individual students and parents," *Gonzaga,* at 536 U.S. at 287, 122 S.Ct. at 2277, because it concerned policies and practices that must be in place to obtain federal funding. Here, the procedures required by PASRR directly impact the individual, in that they determine whether he or she will be placed in a nursing home and what services he or she will receive. Accordingly, § 1396r(e)(7) places "an *unmistakeable focus* on the benefited class"—individuals with mental illness who have been or will be placed in nursing homes. *Gonzaga,* 536 U.S. at 284, 122 S.Ct. at 2275. The statute's requirements that individualized determinations be made, 42 U.S.C. §§ 1396r(e)(7)(A), 1396r(e)(7)(B), suggest that it was intended to create "an *individual* entitlement to services," *Gonzaga,* 536 U.S. at 281, 122 S.Ct. at 2274 (contrasting the provision in *Blessing* which required a state to "substantially comply" with the Social Security Act's requirements), and thus "give rise to individual rights," *id.* at 288, 122 S.Ct. at 2278.

Finally, the fact that the statute is phrased in terms of requirements for a state plan does not foreclose a finding that the statute also includes individual rights-creating language.[19] Several courts have concluded that the Medicaid provisions they confronted conferred individual rights despite phrasing that imposed requirements on participating state plans because it was clear that the provisions otherwise had an individualized focus. *Wilder,* 496 U.S. at 502–03, 110 S.Ct. at 2514; *Rabin,* 362 F.3d at 202; *Harris,* 442 F.3d at 461; *Sabree,* 367 F.3d at 182.[20] In *Rabin,* the Second Circuit focused on § 1320a–2, which specifically states that a "provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." *Rabin,* 362 F.3d at 202 (*quoting* 42 U.S.C. § 1320a–2). Except for the "plan" language, the PASRR provisions at issue here similarly reflect an individual focus and are therefore properly read to confer individual rights.

The legislative history leading to the enactment of the NHRA provides further compelling evidence of Congressional intent to create an implied right of action.[21]

mental condition, the individual requires the level of services provided by a NF [and] whether the individual requires specialized services for the mental illness."); *id.* § 483.126 ("Placement of an individual with MI ... in a NF may be considered appropriate only when ...."); *id.* § 483.132(a) ("For each applicant for admission to a NF and each NF resident with MI....").

**19.** Section 1396a(a)(28)(D)(i) states: "A State plan for medical assistance must provide for compliance ... with the requirements of section 1396r(e) of this title...."

**20.** The provisions in *Wilder, Harris,* and *Sabree* began: "A State plan for medical assistance must...." *Wilder,* 496 U.S. at 502–503, 110 S.Ct. at 2514 (*quoting* 42 U.S.C.

§ 1396a(a)(13)(A) (1982 ed., Supp. V)); *Harris,* 442 F.3d at 461 (*quoting* 42 U.S.C. § 1396a(a)(23)); *Sabree,* 367 F.3d at 182 ns. 4, 5 (*quoting* 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10)). Similarly, the provision in *Rabin* stated that "each State plan ... must provide...." 362 F.3d at 201 (*quoting* 42 U.S.C. § 1396r–6(a)(1)).

**21.** I am mindful that the Court in *Blessing* cautioned that a court must consider specific statutory provisions as opposed to a statute as a whole in determining whether an enforceable right exists. 520 U.S. at 342–43, 117 S.Ct. at 1360. Nonetheless, courts often consider the legislative history of the entire statute in determining Congressional intent. *See, e.g., Wilder,* 496 U.S. at 516–17, 110 S.Ct. at

In *Rolland*, 318 F.3d at 45–47, the First Circuit examined the legislative history of the NHRA at length, and it bears repeating here:

> In 1987, Congress passed the NHRA, part of the Omnibus Budget Reconciliation Act, as a response to th[e] apparently widespread problem [of mentally ill and mentally retarded individuals being placed in nursing homes that were unable to provide the necessary and appropriate services and treatments]. The report from the House of Representatives began:
>
> "Substantial numbers of mentally retarded and mentally ill residents are inappropriately placed, at Medicaid expense, in [skilled nursing facilities] or [intermediate care facilities]. These residents often do not receive the active treatment or services that they need. A recent [Government Accounting Office] review of mentally retarded residents in [these facilities] in Connecticut, Massachusetts, and Rhode Island concluded that the active treatment needs of these individuals were generally not being identified or met."
>
> The NHRA attempted to ensure that those placed in nursing homes actually needed nursing care and that once residing in a nursing home, individuals would receive the other kinds of treatment they needed. Towards that end, the NHRA established requirements for nursing homes in their care of mentally retarded [and mentally ill] residents, 42 U.S.C. § 1396r(b); instituted specific enumerated rights for residents, *id.* § 1396r(c); and required states to screen and provide services to mentally retarded [and mentally ill] residents, *id.* § 1396r(e).

*Rolland*, 318 F.3d at 46 (*quoting* H.R.Rep. No. 100–391, pt. 1, at 459, *reprinted in* 1987 U.S.C.C.A.N. 2313–279). With respect to individuals with mental illness, the population relevant to this case, the House Report further noted:

> Testimony heard by the Subcommittee on Health and the Environment indicates that, in 1985, roughly 980,000 nursing home residents, about two-thirds of the nursing home population, had a primary or secondary diagnosis of mental disorder. Of the nursing home population under age 55, approximately 70 percent have a mental disorder diagnosis; for a number of these diagnoses, such as schizophrenia, depressive disorder, and anxiety disorders, active treatment in community settings can be appropriate. [Accordingly,] the Committee has adopted a two-step approach to end the inappropriate placement of mentally ill or mentally retarded individuals in nursing facilities.

H.R.Rep. No. 100–391, pt. 1, at 459. In concluding that § 1396r created a private right of action, the First Circuit in *Rolland* found that

> [t]he NHRA speaks largely in terms of the persons intended to be benefitted, nursing home residents.... The statute contains a laundry list of rights to be afforded residents and commands certain state and nursing home activities in order to ensure that residents receive necessary services. In short, after clearly identifying those it seeks to protect, the statute goes on to endow them with particular rights, utilizing "rights-creating" language.

*Rolland*, 318 F.3d at 53. *See also Martin 1993*, 840 F.Supp. at 1200 (finding that the

2521–22; *Rabin*, 362 F.3d at 196–97 ("'[T]he interpretation given to the statute must be consistent with the congressional purpose for enacting it.'") (*citing Holloway v. U.S.*, 526 U.S. 1, 9, 119 S.Ct. 966, 970–71, 143 L.Ed.2d 1 (1999)).

PASRR provisions created enforceable rights).

Defendants' strongest argument is that the NHRA is a spending statute; as noted above, the Supreme Court suggested in *Gonzaga* that spending statutes generally do not create enforceable rights. *Gonzaga,* 536 U.S. at 280–81, 122 S.Ct. at 2273–74. Some courts have found this argument persuasive. *See Sparr,* 2002 WL 1608243; *Brogdon,* 103 F.Supp.2d 1322. The Second Circuit, however, has not clearly decided whether funding statutes may confer enforceable rights in light of *Gonzaga. See Kapps v. Wing,* 404 F.3d 105, 127 (2d Cir.2005) ("In the aftermath of the [Supreme] Court's decision in *Gonzaga University,* our circuit has not yet established a unified approach to provisions contained in spending clause statutes such as the [Low Income Home Energy Assistance Act].") (comparing *Taylor v. Vt. Dep't of Ed.,* 313 F.3d 768, 786 (2d Cir.2002) (finding that § 1232g(a) of the FERPA did not create an enforceable right) with *Rabin,* 362 F.3d at 202 (finding that § 1396r–6 of the Medicaid Act did create an enforceable right)).

I conclude that the fact that the NHRA is a spending statute does not preclude a finding that its provisions give rise to enforceable rights. True, the NHRA provides that a state is to be denied payment if it fails to make a PASRR determination or if an individual is not in need of the level of care that a nursing home provides. *See* 42 U.S.C. § 1396r(e)(7)(D). Nonetheless, the NHRA's denial of payment is based on improper *individual* determinations and is thus distinguishable from a denial of funding under FERPA, the statute at issue in *Gonzaga,* which is triggered by a prohibited *policy or practice. Compare* NHRA, 42 U.S.C. §§ 1396r(e)(7)(D)(i), (ii) ("No payment may be made ... with respect to nursing facility services furnished to an individual for whom a determination is required ... but

for whom the determination is not made[; or for] services furnished to an individual ... who does not require the level of services provided by a nursing facility.") *with* FERPA, 20 U.S.C. § 1232g(b)(1) ("No funds shall be made available ... to any educational agency or institution which has a policy or practice of permitting the release of educational records" without consent.). Moreover, as discussed above, it is clear that the intended beneficiaries of the NHRA are mentally ill and mentally retarded *individuals,* and in particular those who have been inappropriately placed in nursing homes. For this reason in particular, the analyses in *Rabin* and *Sabree,* both of which held that the fact that the provisions at issue were part of the Medicaid Act, a spending statute, did not foreclose a finding that the provisions conferred individual rights enforceable through § 1983.

■ For all these reasons, I conclude that plaintiffs are part of the class for whose particular benefit the NHRA was enacted, and that the NHRA creates a federal right that plaintiffs may enforce under § 1983. Accordingly, plaintiffs meet the first *Blessing* factor, as limited by *Gonzaga.* Moreover, there does not appear to be any dispute that the statute meets the remaining two *Blessing* factors—that the statute is not "vague and amorphous" and that it imposes binding obligations on the state. The statute mandates a clearly-defined process to be followed by the state before an individual with mental illness may be admitted to a nursing home and if an individual has a significant change in condition while in the facility. *See* 42 U.S.C. §§ 1396r(e)(7)(A)(i), (e)(7)(B)(i), (e)(7)(C)(iii); 42 C.F.R. §§ 483.104, 483.106, 483.112, 483.126, 483.128, 483.132. The PASRR regulations are precise, unambiguous, and mandatory.

Accordingly, the NHRA confers individual rights that are presumptively enforceable through § 1983, unless the administrative scheme of the NHRA manifests a Congressional intent to "specifically foreclose[ ] a remedy under § 1983." *Smith,* 468 U.S. at 1005 n. 9, 104 S.Ct. at 3464; *see also Gonzaga,* 536 U.S. at 284–85, 122 S.Ct. at 2276; *Blessing,* 520 U.S. at 341, 117 S.Ct. at 1360. "Congress may do so expressly ... or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing,* 520 U.S. at 341, 117 S.Ct. at 1360. The Court in *Blessing* noted, however, that "[o]nly twice [had it] found a remedial scheme sufficiently comprehensive to supplant § 1983." *Id.* at 347, 117 S.Ct. at 1362 (*citing Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), and *Smith,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746).

Defendants here argue that, because the NHRA provides for an appeal of a PASRR determination, and because a Medicaid recipient has a general right to administrative review, Congress intended to foreclose any remedy under § 1983. Def. Mem. 16–18 (*citing* 42 U.S.C. § 1396r(e)(7)(F); 42 C.F.R. § 431.220).[22] However, these review procedures have been held not to constitute a comprehensive remedial scheme sufficient to supplant § 1983. *See Wilder,* 496 U.S. at 521–22, 110 S.Ct. at 2524 (finding that Medicaid administrative scheme and appeals procedures do not foreclose a § 1983 action under the Medicaid Act); *Harris,* 442 F.3d at 463 (finding that Medicaid's grant of an opportunity for a fair hearing is not inconsistent with a

remedy under § 1983); *Sabree,* 367 F.3d at 193 (finding that the administrative hearing process under the Medicaid Act is insufficient to preclude a § 1983 action). "[A] court should 'not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy.' " *Sabree,* 367 F.3d at 193 (*quoting Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 107, 110 S.Ct. 444, 449, 107 L.Ed.2d 420 (1989)).

In addition, defendants contend that federal oversight of a state's Medicaid plan indicates a Congressional intent to foreclose claims brought under § 1983. Def. Mem. 16–18 (*citing* 42 U.S.C. §§ 1396r(f), (g)). However, federal oversight of a state's compliance with the NHRA and the federal government's ability to terminate federal funds have similarly been held to be insufficient to preclude a § 1983 action. *See Wilder,* 496 U.S. at 521–22, 110 S.Ct. at 2524; *Wright v. City of Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 428, 107 S.Ct. 766, 773, 93 L.Ed.2d 781 (1987); *Harris,* 442 F.3d at 463.

Defendants' final argument with respect to the NHRA is that the complaint "fails to set forth any facts whatsoever" to support plaintiffs' NHRA claims. Def. Letter; *see also* Def. Mem. 27–31. However, as discussed above, plaintiffs are not required to set forth detailed facts in their complaint but rather only a "short and plain statement of the claim," FED.R.CIV.P. 8, with sufficient factual allegations "to raise a right to relief above the speculative level." *Twombly,* — U.S. ——, ——, 127 S.Ct. at 1965. Plaintiffs' complaint meets these minimal standards. The complaint provides ample notice to defendants of the

---

22. The NHRA provides: "Each State, as a condition of approval of its plan ..., must have in effect an appeals process for individuals adversely affected by [PASRR] determinations...." 42 U.S.C. § 1396r(e)(7)(F). The Federal Regulations require that a state must grant a hearing to "[a]ny recipient who requests it because he or she believes the agency has taken an action erroneously" and to "any individual who requests it because he or she believes the State has made an erroneous [PASRR] determination." 42 C.F.R. §§ 431.220(a)(2), (a)(4).

violations of the NHRA that are the basis of plaintiffs' claims. Plaintiffs specifically allege that defendants' PASSR program does not include an independent evaluation prior to a nursing home admission, Sec. Am. Compl. ¶¶ 14, 29–30, 164–66, 182, 215–16, 221, that defendants fail to conduct resident reviews when notified by the nursing homes of significant changes in an individual's condition, *id.* ¶¶ 18, 177–78, 218, that defendants fail to ensure that an appropriate, independent evaluation is made as part of the resident review process, *id.* ¶¶ 19, 179, 220, and that defendants fail to provide plaintiffs with copies of their evaluations and PASSR determinations, *id.* ¶¶ 174, 183, 217, 223.[23]

For all these reasons, defendants' motion to dismiss plaintiffs' claims under the NHRA should be denied.

### 3. Associational Standing

Plaintiffs DAI and MHLS bring this action on behalf of their constituents, including *inter alia* individuals with mental illness who reside in nursing homes and those at-risk of residing in a nursing home in the future. DAI is a non-profit organization with statutory authority under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. §§ 10801 *et seq.,* to pursue legal recourse on behalf of New York state residents with mental illness receiving care and treatment. Sec. Am. Compl. ¶ 31. Similarly, MHLS has statutory authority pursuant to New York Mental Hygiene Law Article 47 to pursue legal action on behalf of patients and residents of New York mental health facilities. *Id.* ¶ 32. DAI and MHLS seek to bring claims on behalf of individuals with mental illness who have been or will be unlawfully discharged from psychiatric hospitals and hospital psychiatric wards to nursing homes.[24] *Id.* ¶¶ 40, 42–43.

In 1986, Congress enacted the PAIMI after finding that

individuals with mental illness are vulnerable to abuse and serious injury; ... individuals with mental illness are subject to neglect, including lack of treatment, ... health care, and adequate discharge planning; and State systems for monitoring compliance with respect to the rights of individuals with mental illness ... are frequently inadequate.

42 U.S.C. § 10801(a). Accordingly, the purposes of PAIMI, relevant to this litigation, are

to ensure that the rights of the individuals with mental illness are protected; and to assist States to establish and operate a protection and advocacy sys-

---

**23.** Plaintiffs also allege that the nursing homes fail to notify defendants of significant changes of condition "due to defendants' failure to develop a system to assure that nursing homes notify them when an individual with mental illness experiences a significant change of condition." Sec. Am. Compl. ¶ 180. It is not clear whether this allegation would support a claim entitling plaintiffs to relief because the obligation to initiate the resident review process is on the nursing homes and the nursing homes are not defendants in this action. 42 U.S.C. § 1396r(e)(7)(B)(iii). Nonetheless, at this stage of the litigation, plaintiffs' claim is sufficient, even though they might not ultimately be able to establish that defendants' actions create a "system" in which the nursing homes' inaction leads to liability against the state.

**24.** The complaint appears to allege that DAI and MHLS also seek to bring claims on behalf of all individuals with mental illness who currently reside in nursing homes regardless of where they were prior to their nursing home admissions. *See* Sec. Am. Compl. ¶ 41. In their letter accompanying the second amended complaint, however, plaintiffs specifically state that their ADA and Section 504 claims "are made on behalf of current nursing home residents who w[ere] discharged to nursing homes from state psychiatric hospitals and Article 28 psychiatric wards." Pl. Letter.

tem for individuals with mental illness which will protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State Statutes. . . .

*Id.* § 10801(b). To accomplish these purposes, PAIMI entitles agencies with statutory authority, such as DAI, to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness. . . ." *Id.* § 10805(a)(1)(B).

Independent of PAIMI but around the time of its enactment in 1986, MHLS was established pursuant to New York statute with a broad mandate to represent individuals receiving care and treatment in New York mental health facilities. MHLS has the following statutory responsibilities relevant to this action: "[t]o study and review the admission and retention of all patients or residents," to provide legal services to its constituents "related to the admission, retention, and care and treatment" of patients or residents, and "to initiate and take any legal action deemed necessary to safeguard the right of any patient or resident to protection from abuse or mistreatment. . . ." N.Y. MENTAL HYG. LAW §§ 47.03(a), (c), (e). *See also Bernstein v. Pataki,* 233 Fed.Appx. 21, 24–25 (2d Cir. 2007) (summary order) (recognizing MHLS's statutory authority to bring claims, citing N.Y. Mental Hygiene Law § 47.03); *Shrader v. Granninger,* 870 F.2d 874, 876 (2d Cir.1989) (same); *Ughetto v. Acrish,* 130 A.D.2d 12, 21–23, 518 N.Y.S.2d 398, 404 (Sup.Ct.App. Div.2d Dep't 1987) (same); *Hirschfeld v. Hogan,* 18 Misc.3d 531, 533, 848 N.Y.S.2d 507, 510 (N.Y. Sup. Ct., Nassau County, 2007) (same). Moreover, the New York Rules of Court impose a duty upon the director of MHLS to ensure that "all requirements of law as to patients' admissions, treatment and discharge affecting patients' rights have been complied with." N.Y. COMP.CODES R. & REGS., tit. 22, §§ 622.2(a)(6)(ii), 694.2(a)(6)(ii), 823.2(a)(6)(ii), 1023.2(a)(6)(ii). *See also Hirschfeld,* 18 Misc.3d at 533, 848 N.Y.S.2d at 510.

In *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court held that an association has standing to bring suit on behalf of its members if the following three criteria are met: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441. Defendants acknowledge the statutory authority granted to DAI and MHLS, and propose for purposes of the pending motion that the court assume that plaintiffs have satisfied *Hunt's* first two prongs. Def. Mem. 33. Defendants argue, however, that because plaintiffs seek individualized relief and the individuals with mental illness whose rights are at stake must participate in the litigation, plaintiffs therefore fail *Hunt's* third prong. *Id.* at 32.

In *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996), the Supreme Court considered whether a statute may confer associational standing in abrogation of the *Hunt* test, and in particular its third prong. To answer that question, the Court considered whether all three *Hunt* prongs were constitutionally-based and therefore necessary. The Court concluded that *Hunt's* third prong was "prudential," and stated that

once an association has satisfied *Hunt's* first and second prongs assuring adversarial vigor in pursuing a claim for

which Article III standing exists, it is difficult to see a constitutional necessity for anything more.... Hence the third prong of the associational standing test is best seen as focusing on ... administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution. *Brown Group,* 517 U.S. at 556–57, 116 S.Ct. at 1536. Accordingly, plaintiffs argue that they do not need to satisfy the "prudential" third prong of *Hunt,* given the organizations' statutory authority to bring claims on behalf of their constituents. Pl. Mem. 34.

Several courts have concluded that, in enacting PAIMI, Congress did explicitly grant associational standing to PAIMI organizations, thereby eliminating the need for plaintiffs to meet the third prong of *Hunt. Or. Advocacy Ctr. v. Mink,* 322 F.3d 1101, 1113 (9th Cir.2003) (holding that, "in light of the role Congress assigned by statute to advocacy organizations ... Congress abrogated the third prong of the *Hunt* test"); *N.J. Prot. & Advocacy, Inc. v. Davy,* 2005 WL 2416962, at *2 (D.N.J. Sept.30, 2005) (noting that defendant did not contest that Congress's grant of associational standing pursuant to PAIMI eliminated the need for an organizational plaintiff to meet *Hunt's* third requirement); *Univ. Legal Servs., Inc. v. St. Elizabeths Hosp.,* 2005 WL 3275915, at *4 (D.D.C. July 22, 2005); *Unzueta v. Schalansky,* 2002 WL 1334854, at *3 (D.Kan. May 23, 2002).

■■■ As discussed above, both Congress and the New York legislature clearly intended to confer standing on DAI and MHLS to bring lawsuits to protect the rights of individuals with mental illness in New York. In light of their statutory mandates, I conclude that DAI and MHLS have associational standing to pursue claims on behalf of their constituents in this action without regard to whether they meet *Hunt's* third prong. *See Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condominium,* 458 F.Supp.2d 160, 171–72 (S.D.N.Y.2006) (noting that *Hunt's* third prong is prudential and finding that organization met associational standing test).

Even if plaintiffs were required to satisfy the third prong, I would conclude that the claims plaintiffs assert and the relief they seek are not so individualized as to defeat associational standing. Plaintiffs' complaint seeks only declaratory and injunctive relief. Generally, where plaintiffs seek injunctive relief, the third prong of the *Hunt* test is presumed to be satisfied. *See Bernstein,* 2007 WL 1113263, at *2, 233 Fed.Appx. at 24–25 (summary order) (" 'If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.' ") (quoting *Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 2213, 45 L.Ed.2d 343 (1975)); *Sherwin–Williams Co. v. Spitzer,* 2005 WL 2128938, at *8 (N.D.N.Y. Aug.24, 2005). However, an association does not necessarily satisfy *Hunt's* third prong merely because it seeks only equitable relief; an "organization lacks standing to assert claims of injunctive relief on behalf of its members where 'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof,' or where 'the relief requested [would] require [ ] the participation of individual members in the lawsuit.' " *Bano v. Union Carbide Corp.,* 361 F.3d 696, 714 (2d Cir. 2004) (quoting *Warth,* 422 U.S. at 515–16, 95 S.Ct. at 2214, and *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441).

In *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock,* 477

U.S. 274, 288, 106 S.Ct. 2523, 2532, 91 L.Ed.2d 228 (1986), the union ("UAW") and some of its members challenged the Secretary of Labor's application of a statute that provided benefits to workers laid off due to competition from imports. The defendant challenged UAW's standing on grounds that the union itself suffered no injury but rather brought suit solely as a representative of those of its members injured by defendant's interpretation of the statute. *Brock*, 477 U.S. at 281, 106 S.Ct. at 2528. More specifically, defendant contended that, to grant the relief sought, the district court would be required "to consider the individual circumstances" of each aggrieved UAW worker. *Id.* at 287, 106 S.Ct. at 2531. The Supreme Court rejected this argument and held that, "though the unique facts of each UAW member's claim will have to be considered by the proper state authorities before any member will be able to receive the benefits allegedly due him, the UAW can litigate this case without the participation of those individual claimants and still ensure that 'the remedy, if granted, will inure to the benefit of those members of the association actually injured.' " *Id.* at 288, 106 S.Ct. at 2532 (*quoting Warth*, 422 U.S. at 515, 95 S.Ct. at 2213). *See also Bano*, 361 F.3d at 714 (recognizing that "where the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the *Hunt* test may be satisfied").

As in *Brock*, associational standing is not defeated here by virtue of the individualized relief sought. The claims asserted by plaintiffs may be resolved by answering common questions of law without individualized proof, even though *defendants* may need to undertake individualized assessments if the court grants plaintiffs the relief they seek. *See Rolland v. Cellucci*, 52 F.Supp.2d 231, 242 (D.Mass.1999) ("While each class member may require an individual needs assessment were relief

granted [for alleged violations of the ADA and NHRA], this is not a claim which requires individualized proof as to the claimed violations or compliance with the various statutes at issue."). Plaintiffs' claims here would not require "individualized proof" or participation. Plaintiffs do not contend that any individual plaintiff (other than the two named plaintiffs) is entitled to a court order placing him or her in a community-based treatment program; rather, they allege that defendants have discriminatory policies and practices that unnecessarily place individuals with mental illness in nursing homes as a matter of routine, and without first conducting legally required assessments. Thus, the focus of plaintiffs' proof will be on *defendants'* actions. Moreover, the fact that participation by *some* individuals may be required—for example, to demonstrate the general manner in which defendants fail to ensure that individuals discharged from psychiatric wards or hospitals are properly screened before they are placed in nursing homes—is not fatal to associational standing. *See Warth*, 422 U.S. at 511, 95 S.Ct. at 2212 ("[S]o long as ... individual participation of *each* injured party" is not necessary, "the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.") (emphasis added). In this respect, this case resembles *Hospital Council of Western Pennsylvania v. City of Pittsburgh*, 949 F.2d 83 (3d Cir.1991), in which the court, citing *Warth*, concluded as follows:

Here, the claims asserted by the Council would require some participation by some Council members. This case, unlike many prior associational standing cases, does not involve a challenge to a statute, regulation, or ordinance, but instead involves a challenge to alleged practices that would probably have to be proven by evidence regarding the manner in which the defendants treated in-

dividual member hospitals. Adjudication of such claims would likely require that member hospitals provide discovery, and trial testimony by officers and employees of member hospitals might be needed as well. Nevertheless, since participation by "each [allegedly] injured party" would not be necessary, we see no ground for denying associational standing.

*Hosp. Council*, 949 F.2d at 89–90 (alteration in original).

Although the injunctive relief that plaintiffs seek would, if granted, require individualized evaluations of whether persons with mental illness could appropriately receive care and treatment in a setting more integrated than a nursing home, these individualized assessments would be completed by defendants, not the court. The concern with individualized assessments in *Hunt* and *Bano* was focused on a *court's* undertaking them and the consequent requirement of individual participation in the lawsuit. In contrast, and as in *Brock*, 477 U.S. at 288, 106 S.Ct. at 2532, plaintiffs' suit does not directly seek individualized relief, but instead seeks a court order requiring the defendants to make individualized assessments of the need for nursing home care. *See Bano*, 361 F.3d at 714. Thus, the claims plaintiffs assert and the relief they seek are not too individualized to preclude associational standing.[25]

Finally, on the question of standing, defendants argue that plaintiffs fail to identify an individual with mental illness currently in a psychiatric ward or hospital who is at-risk of being discharged to a nursing home. Def. Letter. Defendants contend that this failure is fatal to plain-

tiffs' allegation of associational standing. Plaintiffs, however, are not required to identify in their complaint specific individuals who may in the future be placed in a nursing home. *See Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir.2004) (recognizing that future "mistakes cannot be specifically identified in advance" but nonetheless granting associational standing). Plaintiffs need only allege, with sufficient factual detail to render the claim plausible, that there is a likelihood of prospective improper discharges to nursing homes. Similarly, I reject defendants' argument that the second amended complaint does not name as a plaintiff any individual who has experienced a significant change in condition without receiving a resident review as required by 42 U.S.C. § 1396r(e)(7)(B)(iii); even if the second amended complaint fails to identify any such specific individual, it clearly alleges that defendants' practices will impose this result on nursing home residents in the future. Sec. Am. Compl. ¶¶ 15–19, 163, 177–81.

For all these reasons, I conclude that organizational plaintiffs DAI and MHLS have associational standing to bring the claims asserted in the second amended complaint on behalf of their constituents.

### 4. Dismissal of the Governor as a Defendant

In their original motion, defendants sought to dismiss the governor as a defendant in this action, arguing that he is not a proper party and should be dismissed in the interests of justice pursuant to Federal Rule of Civil Procedure 21. Def. Mem. 48–49. Plaintiffs sue the governor in his

---

**25.** The conclusion that associational standing is proper is not inconsistent with the conclusion that the NHRA confers individual rights enforceable under § 1983. The NHRA does, as discussed earlier, create rights for individuals with mental illness. Plaintiffs, however,

do not seek individualized court-ordered relief. Rather, the organizational plaintiffs seek to enforce the individual rights of their constituents in a single lawsuit and, if successful, seek system-wide injunctive relief that would inure to the benefit of individual constituents.

official capacity based on his "responsib[ility] for ensuring that New York operates its services, programs and activities in conformity with the Americans with Disabilities Act, the Rehabilitation Act, and the NHRA." Sec. Am. Compl. ¶ 63.

During oral argument on the motion, the parties agreed to resolve the issue among themselves. Tr. 63–65.[26] The second amended complaint again names the governor as a defendant. In their post-argument letter, defendants do not address the issue of the governor as defendant. Accordingly, I infer that defendants have abandoned their argument for dismissal of the governor as a defendant.

### 5. Standing of Individual Plaintiffs

In their original motion, defendants argued that the named plaintiffs lacked standing to pursue their NHRA claims because the named plaintiffs failed to allege specific injuries as a result of any violations of the NHRA. Def. Mem. 40–41. With the filing of the second amended complaint, defendants appear to abandon this argument. See Def. Letter. In any event, plaintiffs' new pleading specifically alleges violations of the NHRA with respect to each of the named plaintiffs. Sec. Am. Compl. ¶¶ 29, 30, 182–84.

 Defendants now appear to argue that the individual plaintiffs lack standing to pursue their ADA and Section 504 claims because the second amended complaint does not specifically allege that a medical professional has determined that they are eligible to reside in a community-

based program rather than a nursing home. See Def. Letter. As discussed above, however, plaintiffs specifically allege that Joseph S. was evaluated and determined not to be in need of a nursing home level of care. Sec. Am. Compl. ¶ 129. Moreover, the complaint alleges that both of the named plaintiffs have a mental illness but no medical condition requiring a nursing home level of care, id. ¶¶ 27, 128–29, 137, and that both are "able to, qualified for, and would like to live in a more integrated setting" than the nursing homes in which they reside. Id. ¶¶ 134, 140. See also id. ¶ 28. Accordingly, the named plaintiffs have standing to pursue the claims they make in the second amended complaint.

### 6. Necessary Parties

Next, defendants argue that the complaint should be dismissed for failure to join necessary parties pursuant to Federal Rule of Civil Procedure 19. Defendants contend that the hospitals from which individuals with mental illness are discharged and the nursing homes where they are placed are necessary parties to this litigation.

 Under the Federal Rules of Civil Procedure, a party is deemed "necessary" if "in that [entity's] absence, the court cannot accord complete relief among existing parties." FED.R.CIV.P. 19(a)(1).[27] If a court finds that a party is necessary but joinder is not feasible, only then would it consider whether dismissal is warranted,

---

**26.** "Tr." refers to the oral argument of February 20, 2008 on defendants' motion to dismiss.

**27.** A person or entity may also be a necessary party if "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may. as a practical matter impair or impede the person's ability to pro-

tect the interest." FED.R.CIV.P. 19(a)(1)(B)(i). "Under the impair or impede clause, however, the absent party itself must assert an interest in the subject matter of the pending case." M.C. v. Voluntown Bd. of Educ., 178 F.R.D. 367, 370 (D.Conn.1998). Here, the nursing homes and hospitals have not sought to intervene in this litigation and thus they may not be deemed necessary under the impair or impede clause of Rule 19.

applying the factors set forth in Rule 19(b). Defendants, as the moving party, bear the burden of establishing that joinder of necessary parties is required. *See Bodner v. Banque Paribas,* 114 F.Supp.2d 117, 137 (E.D.N.Y.2000); *M.C. v. Voluntown Bd. of Educ.,* 178 F.R.D. 367, 369 (D.Conn.1998).

Under Rule 19(a)(1), "the term complete relief refers only 'to relief as between the persons already parties, and not as between a party and the absent person whose joinder is sought.' " *Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York,* 762 F.2d 205, 209 (2d Cir.1985). *See also Gen. Refractories Co. v. First State Ins. Co.,* 500 F.3d 306, 313 (3d Cir.2007) (limiting the "Rule 19(a)(1) inquiry to whether the district court can grant complete relief to persons *already named* as parties to the action; what effect a decision may have on absent parties is immaterial"). Accordingly, the question is whether any relief obtained would be hollow if the absent party is not joined, and "[c]ourts are most likely to rule that complete relief may not be accorded among the parties present in circumstances where the absent party plays a significant role in the provision of some form of injunctive relief." *Rose v. Simms,* 1995 WL 702307, at *3 (S.D.N.Y. Nov.29, 1995).

Defendants contend that it is nursing homes that conduct the resident reviews that are part of the PASRR process, and that nursing homes are the entities responsible for notifying the state of any "significant change" in the condition of a mentally ill nursing home resident. Def. Mem. 42 (*citing* 42 U.S.C. § 1396r(b)(3)(E)). During oral argument on the motion, defendants also argued that the homes are necessary parties because the homes cannot admit individuals who are not in need of nursing care. Tr. 30 (referencing 42 U.S.C. § 1396r(b)(3)(F)). Plaintiffs respond that the nursing homes are not necessary because the relief they seek is a court order directing defendants to conduct the screening and reviews required by statute, and to provide community-based treatment to individuals qualified to receive it. Pl. Mem. 39–40. Plaintiffs rely on *Rolland,* 318 F.3d at 58, in which the First Circuit affirmed the district court's order that the state defendants implement treatment policies in compliance with the NHRA, and in particular, § 1396r(e), even though the nursing homes where plaintiffs resided were not parties to the litigation. *Id.*

Section 1396r(e)—titled *"State requirements relating to nursing facility requirements"* (emphasis added)—clearly places the ultimate responsibility for the initial PASRR determination on the state. *See* 42 U.S.C. § 1396r(e)(7)(A)(i) ("[T]he State must have in effect a preadmission screening program for making determinations ...."). The Federal Regulations explicitly provide that the state, here OMH, is responsible for the PASRR determinations. *See* 42 C.F.R. § 483.106(d)(1) (requiring the PASRR determinations be made by the state mental health authority); *id.* § 483.112(a) (requiring the state mental health or mental retardation authority to make determinations as to whether an individual requires the level of care provided by nursing facilities); *id.* §§ 483.128(a), (e) (discussing the requirements for a state's PASRR program); *id.* § 483.132(d) ("[T]he State mental health or mental retardation authority must determine whether [a nursing facility] level of services is needed."). Moreover, all of the relief sought in the second amended complaint is directed at the defendants; plaintiffs do not seek any affirmative relief from nursing homes. Although some aspects of the relief sought—such as an order requiring defendants to conduct resident reviews of nursing home residents—might require the cooperation of nursing homes, there is no reason to believe they would not coop-

erate with the efforts of the defendants to comply with any order issued by this court. Accordingly, the nursing homes are not necessary parties.

With respect to the Article 28 hospitals, defendants contend that the hospitals are responsible for discharge planning and are therefore necessary parties to this litigation. Def. Mem. 43–44. As plaintiffs argue, however, the hospitals are not necessary parties because no relief requested by plaintiffs requires their participation, Pl. Mem. 40–41; rather plaintiffs seek to enforce the duties imposed by the NHRA upon defendants OMH and DOH.

### 7. Statute of Limitations

This action was filed on March 8, 2006. The parties agree that a three-year statute of limitations governs each of plaintiffs' claims. Def. Mem. 45; Pl. Mem. 41. The individuals on whose behalf plaintiffs assert claims include some who were discharged to nursing homes and whose rights under the NHRA were allegedly violated on or after March 8, 2003. Clearly then, none of plaintiffs' claims are time-barred in their entirety even absent any basis for tolling. However, plaintiffs seek relief for *all* individuals with mental illness currently residing in nursing homes, regardless of when they were discharged from psychiatric hospitals and psychiatric wards of hospitals or when they were allegedly not properly screened or reviewed as required by the NHRA. Sec. Am. Compl. wherefore clauses f(vi), (vii). It is less clear whether claims concerning individuals who were discharged to nursing homes or were entitled to resident reviews before March 8, 2003 are timely. Because the limitations issues that arise with respect to plaintiffs' NHRA claims are different from those that apply to their ADA and Section 504 claims, I address each set of claims separately below.

■ Plaintiffs' ADA and Section 504 claims are timely because they assert *present* and ongoing violations of the statutes' integration mandates, rendering the date of any particular individual's discharge to a nursing home irrelevant. Pl. Mem. 42; Pl. Letter. In other words, plaintiffs contend that their rights under the ADA and Section 504 are being violated *now*, regardless of then they were discharged to nursing homes, because they have a right *today* to be released from the nursing home and to receive care in a more integrated community-based setting. Thus, no time bar arises from the date on which they were admitted to a nursing home.

In *Martin v. Voinovich*, 840 F.Supp. 1175 (S.D.Oh.1993), a plaintiff class consisting of persons with mental retardation or developmental disabilities brought suit under the ADA and Section 504. The court refused to dismiss plaintiffs' claims on limitations grounds, even though many had been placed in institutions on dates outside the limitations period. Although the court's reasoning was somewhat different than that set forth above, its analysis applies to the facts at issue here:

> Plaintiffs allege they are eligible for community placement, yet they continue to live in institutions. They allege that based on their disabilities they have been denied community placement. Each time a position becomes available in the community and a plaintiff or member of the plaintiff class is denied that position on the basis of disability, there is an alleged violation. Therefore, the Court finds that the acts of discrimination alleged by plaintiffs are not based solely on isolated incidents. Instead, the alleged discrimination is an ongoing and continuous violation.

*Martin 1993*, 840 F.Supp. at 1189.[28] Other courts have also permitted ADA and 504

---

**28.** The class in *Martin 1993* also brought

NHRA claims. The court's limitations analy-

claims brought on behalf of individuals who were institutionalized before the limitations period, albeit without explicit discussion of any limitations issues. *See Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 378 (3d Cir.2005) (noting that many residents had been institutionalized for decades); *Frederick L. v. Dep't of Pub. Welfare of Pa.,* 364 F.3d 487, 489 (3d Cir.2004) (noting that over two-thirds of a class had been institutionalized for more than ten years). Accordingly, plaintiffs' ADA and Section 504 claims are timely.

Unlike the ADA and Section 504, which afford plaintiffs an ongoing right to receive services in the most integrated setting appropriate to their needs, the NHRA, insofar as relevant here, is concerned with specific events: admissions to nursing homes and significant changes in the condition of nursing home residents. Plaintiffs nevertheless contend that these claims are timely, even with respect to individuals discharged to nursing homes before March 8, 2003, because of the continuing violation doctrine, the toll for insanity, and equitable tolling.

### a. Continuing Violation

██ Plaintiffs contend that defendants' "ongoing failure to maintain a PASRR program in compliance with the NHRA" is a "continuing violation" and that plaintiffs' NHRA claims are therefore not barred by any statute of limitations. Pl. Mem. 43–44. A continuing violation occurs "where there is proof of specific ongoing discriminatory policies or practices." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). When a plaintiff successfully establishes a continuing violation, the statute of limitations is tolled until the "last asserted occurrence

of that practice." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380–81, 102 S.Ct. 1114, 1125, 71 L.Ed.2d 214 (1982).

██ An association's right to sue is coextensive with the claims available to its individual members. *See Hunt,* 432 U.S. at 343, 97 S.Ct. at 2241 (holding that an association has standing to sue on behalf of its members if "its members would otherwise have standing to sue in their own right" and other requirements are met). Accordingly, DAI and MHLS may only pursue those claims that its constituents could bring. The timeliness of the NHRA claims asserted in the second amended complaint therefore hinges on whether the claims would be timely if asserted by the individual constituents of DAI and MHLS themselves.

Plaintiffs suggest that the continuing violation rule may be applied to otherwise stale individual claims whenever a defendant's unlawful practices continue during the limitations period, regardless of whether the individual plaintiff is the subject of any actions taken pursuant to those practices within the limitations period. Pl. Mem. 43–44. However, the rule is more narrowly construed. "[T]he concept of a 'continuing violation' is not intended to be an open-ended escape hatch to allow litigants who have failed to promptly bring suit to enforce their rights to avoid the consequences of the limitations period." *Bourdais v. City of New Orleans,* 2005 WL 3801576, at *4 (E.D.La. Apr.29, 2005). To the contrary, most courts have interpreted the Supreme Court's ruling on continuing violations in *Havens Realty* as requiring a plaintiff to establish not only an unlawful policy but also a violation *that specifically affects the plaintiff* within the limitations

---

sis did not distinguish between the ADA and Section 504 claims on the one hand and the NHRA claims on the other. As set forth in the text below, I conclude that a different analysis should be applied to each group of claims, and that aspects of plaintiffs' NHRA claims are time-barred.

period. Construing *Havens Realty,* the court in *Bourdais* held as follows:

> In the *Havens* case, the Supreme Court made a distinction between plaintiffs who have or have not been personally affected by an alleged continuing violation. Applying the "policy or practice" type of continuing violation theory, the Court held that only those plaintiffs who were personally affected by an illegal act of defendant within the applicable limitations period were entitled to assert a claim based on defendant's continued unlawful acts or policy.

2005 WL 3801576, at \*4. *See also Cornwell,* 23 F.3d at 704 (finding claim timely where a specific individual was subjected to defendant's continuing discriminatory practices); *Claybrooks v. Primus Auto. Fin. Servs., Inc.,* 363 F.Supp.2d 969, 982–83 (M.D.Tenn.2005) (harmonizing *Havens* with Sixth Circuit precedent requiring that "a plaintiff must show both a continuing, over-arching policy of discrimination and a specific discriminatory act against the plaintiff within the limitations period," and collecting cases); *but see Barkley v. Olympia Mortgage Co.,* 2007 WL 2437810, at \*15–16 (E.D.N.Y. Aug.22, 2007) (construing *Havens* to permit plaintiffs whose claims were time-barred to pursue them because defendants had engaged in an ongoing discriminatory practice that continued into the limitations period).

The holding in *Bourdais* is consistent with the rationale supporting the continuing violation rule. The rule is typically applied when a plaintiff can not reasonably be expected to recognize that he has a cause of action until he becomes aware that the otherwise time-barred discriminatory conduct he complains of is part of an unlawful policy or practice. Under these circumstances, a cause of action

> does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a ... "policy or custom." In fact, [Second Circuit precedent] recognizes that sort of delayed accrual theory: "Where no single act is sufficiently decisive to enable a person to realize that he has suffered a compensable injury, the cause of action may not accrue until the wrong becomes apparent."

*Pinaud v. County of Suffolk,* 52 F.3d 1139, 1157 (2d Cir.1995) (*quoting Singleton v. City of New York,* 632 F.2d 185, 192–93 (2d Cir.1980)); *see also Hargraves v. Capital City Mortgage Corp.,* 140 F.Supp.2d 7, 18 (D.D.C.2000) ("The continuing violations theory should be applied where the type of violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period."), *quoted in Pantoja v. Scott,* 2001 WL 1313358, at \*11 (S.D.N.Y. Oct.26, 2001) (internal quotations omitted); *Johnson v. Nyack Hosp.,* 891 F.Supp. 155, 165 (S.D.N.Y.1995).

■ This narrow construction of the continuing violation rule is also consistent with more recent Supreme Court precedent. In *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Court held that discrete acts, even those that may be part of a continuing policy or practice, are not saved by the continuing violation rule. *Morgan,* 536 U.S. at 113–14, 122 S.Ct. at 2072–73. In reaching this holding, the *Morgan* Court distinguished claims based upon discrete events from hostile environment claims as follows: "The 'unlawful employment' practice [in hostile environment claims] ... cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be

actionable on its own." *Id.* at 115, 122 S.Ct. at 2073. *See also Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* —— U.S. ——, ——, 127 S.Ct. 2162, 2167–69, 167 L.Ed.2d 982 (2007) (reaffirming that a violation with continuing effects does not toll the limitations period). Defendants' alleged violations of the NHRA—failures to conduct PASSR evaluations for individuals over a number of years—are "each discrete, actionable offenses. The plaintiffs' claims are not based on the accumulation over several years …; rather, the plaintiffs have separate claims for each [PASSR violation]." *SJB ex rel. Berkhout v. New York City Dep't of Ed.,* 2004 WL 1586500, at *8 (S.D.N.Y. July 14, 2004). Plaintiffs' NHRA claims (unlike their claims pursuant to the ADA and Section 504) are more akin to the discrete employment practices that the *Morgan* Court held were not saved by the continuing violation rule than they are to hostile work claims.

Finally, the continuing violation rule "is disfavored by courts in this circuit." *Mallard v. Potenza,* 2007 WL 4198246, at *4 n. 3 (E.D.N.Y. Nov.21, 2007) (*citing Nakis v. Potter,* 2004 WL 2903718, at *10 n. 2 (S.D.N.Y.Dec.15, 2004) (collecting cases)). *See also Morgan,* 536 U.S. at 113, 122 S.Ct. at 2072 (noting that equitable tolling doctrines should be applied "sparingly"). For all these reasons, application of the continuing violation rule is not warranted here, and it does not save the claims of those individuals whose claims under the NHRA are based upon events that took place before March 8, 2003.

*b. Insanity Toll*

■ Plaintiffs next argue that the limitations period should be tolled because this case is brought on behalf of individuals with mental illness who are institutionalized. Under New York law, the statute of limitations is extended for individuals suffering from "insanity at the time the cause of action accrues." N.Y. C.P.L.R.

208. The Court of Appeals has stated that New York's insanity toll should be "narrowly interpreted" based on its legislative history, which indicates that efforts to substitute the phrase "mental illness" for "insanity" were rejected. *McCarthy v. Volkswagen of Am., Inc.,* 55 N.Y.2d 543, 548, 450 N.Y.S.2d 457, 435 N.E.2d 1072 (1982). The Court concluded that the insanity toll applies "only to those individuals who are unable to protect their legal rights because of an overall inability to function in society." *Id. See also Basher v. Madonna Realty Corp.,* 2007 WL 174130, at *3 (E.D.N.Y. Jan.19, 2007) (discussing *McCarthy's* "high bar" for establishing insanity under CPLR 208).

Plaintiffs cite one case from the New York Court of Claims, *Muller v. State,* 179 Misc.2d 980, 987, 686 N.Y.S.2d 652, 657 (N.Y.Ct.Cl.1999), for the proposition that psychiatric hospital patients are entitled to a *per se* toll of the statute of limitations due to insanity. Pl. Mem. 44–45. Plaintiffs argue by extension that "New York courts would apply a *per se* toll" to individuals confined in a nursing home for treatment of mental illness. *Id.* at 45.

■ Plaintiffs' argument for a *per se* toll is unavailing. First, New York law does not unequivocally apply a *per se* toll for psychiatric hospitalization. *See, e.g., Vallen v. Carrol,* 2005 WL 2296620, at *3–5 (S.D.N.Y. Sept.20, 2005) (rejecting automatic insanity toll based on plaintiff's institutionalization). This court's research has not identified any authority, other than the single case cited by plaintiffs, supporting application of a *per se* toll. Second, in light of the Court of Appeals' admonition that the insanity toll should be narrowly interpreted, I would decline to extend its application to nursing home residents, even when the homes have policies as restrictive as those alleged by plaintiffs here. Sec. Am. Compl. ¶¶ 2, 93–125. Finally,

plaintiffs do not allege any facts suggesting that their constituents suffer from "insanity" and an "over-all inability to function in society." Indeed, such allegations would seem to contradict their assertions that the individuals at issue are capable of receiving appropriate care and treatment in community settings. Thus, plaintiffs have failed to establish that the insanity toll should apply to their NHRA claims in this case.

### c. Equitable Tolling

Finally, plaintiffs contend that the statute of limitations on their NHRA claims should be equitably tolled due to defendants' failure to provide their constituents with copies of their PASRR evaluation reports as required by the NHRA. *See* 42 C.F.R. §§ 483.128(k), (*l*). "The essence of the doctrine of equitable tolling of a statute of limitations 'is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action.'" *Bodner*, 114 F.Supp.2d at 135 (citation omitted). Thus, equitable tolling may be appropriate where defendants fail to comply with mandatory notice requirements. *See Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 324 (2d Cir.2004) ("hold[ing] that failure to comply with the regulatory obligation to disclose the existence of a cause of action ... is the type of concealment that entitles plaintiff to equitable tolling of the statute of limitations"); *see also Ledbetter*, —— U.S. at ——, 127 S.Ct. at 2169 (noting that plaintiff made no claim "that discriminatory decisions that occurred prior to that period were not communicated to her").

■ Equitable tolling, however, "is a rare remedy to be applied in unusual circumstances." *Wallace v. Kato*, —— U.S. ——, ——, 127 S.Ct. 1091, 1100, 166 L.Ed.2d 973 (2007); *see also Zerilli–Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir.2003) ("[E]quitable toll-ing is only appropriate in [ ] rare and exceptional circumstance[s], in which a party is prevented in some extraordinary way from exercising his rights.") (internal quotation marks and alteration omitted). A plaintiff seeking equitable tolling "must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir.2001) (citations omitted).

■ Applying these principles to the circumstances presented here, I conclude that equitable tolling is not warranted. Although defendants allegedly failed to provide individuals with their PASSR evaluations and reports, plaintiffs were not otherwise prevented from pursuing their NHRA claims that independent evaluations were not completed or that they were "rubber-stamp" evaluations. The organizational plaintiffs were or should have been aware at the time of any violations that defendants were not complying with the NHRA. DAI and MHLS have a statutory duty to ensure that the rights of individuals with mental illness are protected. As noted earlier, MHLS in particular is charged with ensuring that "all requirements of law as to patients' admissions, treatment and discharge affecting patients' rights have been complied with." N.Y. COMP.CODES R. & REGS., tit. 22, §§ 622.2(a)(6)(ii), 694.2(a)(6)(ii), 823.2(a)(6)(ii), 1023.2(a)(6)(ii). There appears to be no reason why DAI and MHLS could not have uncovered defendants' alleged unlawful practices sooner. Moreover, as defendants point out, DAI undoubtedly became aware of defendants' practices no later than October, 2002, when The New York Times wrote a series of articles about individuals with mental

illness in nursing homes. Def. Reply 21 n. 16. For these reasons, I conclude that the circumstances of this case do not warrant application of the doctrine of equitable tolling.

## CONCLUSION

For all the reasons stated above, I respectfully recommend that defendants' motion to dismiss be denied, with the exception that plaintiffs' NHRA claims be dismissed to the extent they are based on events that occurred before March 8, 2003. Any objections to the recommendations made in this Report must be filed within ten days of this Report and Recommendation and, in any event, on or before May 5, 2008. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e), 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).